## THE CORRECTION OF ERRORS,

### OF THE

## STATE OF NEW-YORK.

---

Argued in the session of the Court holden in June and July, 1828, and
determined in December of the same year.

---

CONTINUED FROM VOLUME FIRST.

---

## SCHAUBER vs. JACKSON, ex dem. Bogert and others.

A defendant in ejectment, a naked possessor without color or claim of right, is entitled to have facts and circumstances submitted to a jury, from which a presumption may arise of a conveyance of the estate claimed by the lessors of the plaintiff; so that if, in the judgment of the jury, such facts and circumstances are sufficient to warrant the inference of a conveyance, they may say so; and by thus shewing the title out of the lessors of the plaintiff, a defendant may protect his possession, although he may be unable to trace such title to himself.

PRINCIPLES contained in the opinion delivered by the CHANCELLOR.

If there is not sufficient in a will to take the case out of the rule of law, that all the estate which is not legally and sufficiently devised to some other person must go to the heir, the heir will take, whatever may have been the intention of the testator.

A devise in fee by implication has been allowed where the general objects of the will could not otherwise be carried into effect, and where it was evident that the testator intended that executors or trustees should have such estate; but the same reasons do not exist to induce the court to seek out some particular expression in the will for the purpose of giving the estate

VOL. II.                                3

*to* the executors by implication, where the intention of the testator as to the final disposition of his estate can be carried into effect under a *power of sale* as well as under a *devise* to them.

Deeds, patents, judgments, and even acts of parliament, may be presumed to support the long and uninterrupted possession or enjoyment of a *right* or *claim of right;* but there is not a case to be found in which a conveyance has been presumed to defeat the claim of a person showing a good paper title, unless there had been an adverse possession or enjoyment under claim of right, and *in accordance with the fact presumed.*

The presumption in favor of a grant, and against written evidence of title, can never arise from the mere neglect of the owner to assert his right, and where there has been no adverse title or enjoyment by those in whose favor the grant or conveyance is to be presumed.

PRINCIPLES *contained in the opinion delivered by* OLIVER, *Senator.*

A defendant in an action of ejectment is entitled to avail himself of an outstanding title against the lessors of the plaintiff, although he is in possession without color or claim of title; his possession is good against all the world except the legal owner, and by shewing the title in another, he destroys the plaintiff's right to recover.

A conveyance, or facts and circumstances having been shewn from which a conveyance might be presumed, divesting the estate claimed by the lessors of the plaintiff, the title of the grantee of such estate under such conveyance cannot be presumed to be *extinguished* from mere lapse of time. An absolute estate in fee simple cannot revert to the grantor, except in the case of a grant by the state, where it may revert for lack of heirs by way of escheat.

PRINCIPLES *contained in the opinion delivered by* STEBBINS, *Senator.*

Where a testator, by his last will and testament, previous to our *statute of descents,* gave his eldest son twenty shillings for his birth-right, declaring that thereby he excluded and debarred him from all claims and demands as heir at law, and authorized and directed his executors (another son and a daughter) to sell and dispose of all his estate, real and personal, and to divide the avails amongst his four children and a grand-child, in equal proportions, retaining the portion of the grand-child until his arrival of age or marriage, but devising the estate to no one, by express words ; the estate vested in the executors by *implication,* and *in trust* for the children amongst whom the proceeds of the sales were directed to be divided.

The executors did not take a fee as having a power coupled with an interest, because a power coupled with an interest must be a power engrafted upon an estate, not an interest arising out of the execution of the power. Neither the power, nor an interest in its execution, raise an estate by implication ; but where the testator clearly evinces an intention to postpone the heir, an estate is raised by implication, if consistent with the provisions of the will and the apparent intent of the testator, and especially where such implication is necessary, to conform to the express provisions of the will. Directions by a testator to his executors to sell his estate, divide the proceeds and retain the share of a grand-child until his arrival of age, is evidence of an intention that the executors should take the estate, where the heir has been expressly excluded.

The intention to disinherit the heir is always necessary to raise an estate by implication. Had the will stopped after declaring that the heir should not take the estate, he would, nevertheless, have taken, because it would have been given to no other person. Had the disinheriting clause been omitted, he would have taken, because there is no devise, in express terms, to the executors, and there would have been no intention manifested to postpone the heir, nor any inconsistency in his taking the estate until the executors should sell; but, as the testator did say that his heir should not take, and that his executors should sell for the benefit of all his children, it is necessarily implied that the executors did take, until the execution of their power as trustees, for those beneficially interested in its execution.

Whether a fact, which is unknown, *is to be presumed*, from its usual connection with other facts which are known, *it seems*, is properly, in all cases, a question for the jury. The modern practice, however, of taking verdicts, subject to the opinion of the court, has led to adjudications upon matters of fact as questions of law; and questions of fact, which formerly were determined by the jury alone, have now become questions of law, and the jury is said to be concluded by them, as in the case of the presumption of payment of a bond, the legal presumption of fraud, &c. Where, however, the presumption is not urged as a rule of law, binding upon the jury, but by way of evidence, to which the jury may give such credit as it deserves, whether a fact shall be presumed or not, is ordinarily a question for the jury.

A defendant cannot controvert a plaintiff's title by shewing a title in some third person, where he entered by the permission of the plaintiff, or as an intruder upon the possession of the plaintiff without such permission, and without claim of title, or where the plaintiff claims under a judgment and execution against the defendant. In these cases, he is estopped from setting up an outstanding title.

Where a person intrudes, without claim of right, upon the *actual* possession of another, there is reason in compelling him to restore the possession before he be permitted to shew title in a third person. But the reason does not apply in a case of that constructive possession which the law implies as following title ; and a defendant entering, declaring that he takes the lands as a mere possession, acknowledging his ignorance of the owner, and expressing a desire to discover him, for the purpose of purchasing, is not precluded from shewing the title out of the lessors of the plaintiff, notwithstanding he may be unable to trace it to himself.

ERROR from the supreme court. This cause came before the court on a bill of exceptions tendered and signed at the Saratoga circuit, in June, 1826, when the cause was tried before the Hon. REUBEN HYDE WALWORTH, then judge of the fourth circuit, and a verdict found for the plaintiff. The defendant, on the bill of exceptions, moved the supreme court for a new trial, which, in May term, 1827, was denied, and judgment rendered for the plaintiff; to reverse which, this writ of error was brought.

The plaintiff claimed to recover the premises in question on the demises of William Green and Peggy Bogert, two of the lessors, descendants of William Appel, the original patentee of a tract of about 2000 acres of land situate in the now county of Saratoga. The patent was granted in 1708 to William Appel, in trust, as to a moiety thereof, for the right heirs of Harmanus Hagerdorn, and as to the other moiety, for the proper use of the patentee. On the 4th August, 1713, the patentee, by a release in due form of law executed, in which he is described as " Wm. Appel, of the city of New-York, *vintner*," conveyed to Hendrick Hagerdorn and others, described as the right heirs of Harmanus Hagerdorn, deceased, the *east* half of the tract, a division having been made of the same, by which the east half had been allotted to them, and the west half to the patentee, as recited in the release. The Hagerdorns entered into possession of the east half, and possessions have been continued of the same under them to the present day. On the 12th June, 1733, the patentee executed a mortgage of the *west* half of the tract to Christopher Bancker and others, to secure the payment of the sum of £108 10, in one year after the date of the mortgage. This mortgage contained covenants of seisin, for further assurance, &c. &c. On the 9th August, 1738, the last will and testament of William Appel was proved, bearing date the 17th July, 1729, in which the testator is described as " William Appel, of the city of New-York, *vintner*." By this will, the testator gives to his son *Simon* twenty shillings for his birth-right, "wherewith (in the words of the will,) I do hereby utterly exclude, debar and preclude him, my said son, from having or claiming any other or farther pretensions, claims and demands whatsoever, *as being my heir at law*, or by any other pretexts, pretence, color or shew whatsoever." Then, after bequests of specific legacies to several persons, follows this clause : " Item. I do by these presents authorize and empower, order and direct my executors herein after named, to grant, bargain, sell and dispose of all and singular my whole and entire real and personal, moveable and immoveable estate, of whatsoever nature, kind, quantity or property the same may be found after my decease, to any person or persons what-

ever, that is to say, all my lands, messuages and tenements, situate, lying and being as well within the city of New-York as elsewhere, or wheresoever the same shall be found, belonging or of right appertaining to me, within such time and in such manner, either at public vendue or otherwise, as to my executors shall seem necessary and convenient. And further, I do hereby will and declare that their conveyance or conveyances, for the whole or any part thereof, shall be deemed and esteemed to be good, valid and substantial, and effectual in law to the purchaser or purchasers of the same, and to his, her and their heirs and assigns forever against my heirs and every of them forever, to all intents, constructions and purposes whatever, as if I myself in my life time had actually and *bona fide* sold the same." The monies arising from such sale, after the payment of the specific legacies, were directed to be divided between the children of the testator, viz. *Simon, Johannes,* Mary, Magdalena and Engeltje, and his grandson, Jacobus Berry, to each one fifth part thereof; the share of the grandson to be retained in the hands of the executors until he arrived to the age of twenty-one or married; and in case of his death before the happening of either event, such share to be equally divided between the four children of the testator. The testator appointed his son, *Johannes,* and his daughter, Engeltje, executors of his will. Engeltje and her husband, John Van Sice, under their hands and seals, renounced the execution of the will; but Johannes Appel proved the will and took out letters testamentary.

To shew the pedigree of the lessors of the plaintiff, a sworn copy of the records of the Dutch church in the city of New-York was produced, from which it appeared, that on the 26th May, 1695, William Appel and Magdalena his wife had a son baptized of the name of *Simon;* that on the 2d September, 1719, Simon Appel and Maria Gooding had a daughter baptized of the name of *Magdalena,* and on the 24th September, 1721, another of the name of *Gertrude;* and that on the 25th August, 1743, Magdalena Appel was married to Abraham Peltz. A witness testified that she knew Mrs. Peltz before her marriage; that she was then called Magdalena

Appel; that she had a sister who married a Mr. Green; that William Green, who is now living, is the issue of that marriage. This witness also proved Mrs. Bogert, one of the lessors of the plaintiff, to be the grand-daughter of Mrs. Peltz. The last will and testament of Mrs. Peltz, bearing date the 21st May, 1795, was also produced, by which all her estate, real and personal, was devised to Mrs. Bogert. Mrs. Peltz died in September, 1795. The husband of Mrs. Bogert was then living. He died in March, 1820. The plaintiff also produced in evidence an arbitration bond between Magdalena Peltz and one Nicholas Killman, bearing date the 13th November, 1767, in which Magdalena Peltz, in behalf of herself and all others claiming under the will of William Appel, insisted that a certain dwelling house and lot in the city of New-York, which Killman sought to recover in an action of ejectment, under a mortgage executed by John Appel, (who it was recited was then deceased,) belonged to her and others claiming under the will of William Appel, alleging that John Appel had purchased in a mortgage upon the said premises with money belonging to them and him, the said John Appel, and in trust for all claiming under the will of William Appel. The original petition for the grant, the deed to Hagerdorns, the will of William Appel, and the mortgage to Bancker and others, were submitted to the jury to prove the identity of William Appel, by comparison of hand writing.

The defendant was shewn to be in possession of a farm on the west half of the tract granted to William Appel. His father entered into possession of the same about 50 years before the trial, declaring he took it as a mere possession; that he was desirous to find the owner so that he might purchase of him, but could not ascertain who was the owner. He died in possession about 20 years before the trial; and at his death his son succeeded to the possession. The father of the defendant planted an orchard, erected a convenient barn, made a large clearing on the premises, and put the same in good fence. The defendant, after the death of his father, erected a large and valuable house and new barn on the premises, and extended the clearing, the whole of which has been kept in good tenantable order. A witness on the part of the

plaintiff testified, that the west half of the patent was gener-
ally spoken of by the settlers and those in the neighborhood,
as lands the owners of which could not be discovered.

To repel the proof or presumption that the lessors of the
plaintiff were the descendants or heirs at law of William Ap-
pel, the patentee ; or if they were such descendants, to raise
the presumption that the patentee in his life time, or his ex-
ecutors after his death, had sold and conveyed all his inter-
est in the west half of the tract, the defendant adduced the
following testimony : A lease and release of a lot of land
in the city of New-York, bearing date the 2d and 3d of June,
1715, executed by William Appel, of the city of New-York,
*victualler*, and *Remerigh* his wife, to May Bickley ; a deed
of another lot in same place, bearing date the 2d December,
1715, from William Appel, *victualler*, and *Remerigh* his wife,
to Michael Pefee ; the declarations of Mrs. Peltz in her life
time, made to an intimate friend, who testified that she had
often heard her speak of her property, and say that all she had
was two houses in the city of New-York, from which she re-
ceived rent ; the fact that the husband of Mrs. Bogert was
by profession a lawyer, possessed considerable property, and
resided during his life time in the city of Albany, within 20
miles of the west half of the Appel patent ; the will of Wil-
liam Appel, for the purpose of shewing that authority was
given to, and that it was made the duty of the executors to
sell his estates, real and personal ; a deed from Abraham
Yates to Jacobus C. Peek, bearing date the 25th January,
1777, conveying a tract of land in the east half of the Appel
patent, and designating the west half as the land of Oliver De
Lancy and Peter Dubois ; a deed of the same premises, with
the same description from John Garnsey to Edward Rexford,
bearing date the 24th July, 1779 ; the evidence of a witness
that he had known the west half of the Appel patent since
1780, that on the north end thereof it had been cultivated
and settled upwards of forty years, that it was generally call-
ed and reputed to be the land of Oliver De Lancy and Pe-
ter Dubois until sometime after the revolutionary war, and
subsequently to that time it has generally been spoken of as
land the owners of which could not be found.    On his cross-

examination, this witness stated that he lived within a mile of the land ; that he never heard that any persons who are or have been in possession, ever claimed title under the Appel family, or De Lancy or Dubois ; that he never heard any of the old settlers on the land call it De Lancy and Dubois' land ; but the persons now in possession insist that it was conveyed to De Lancy and Dubois.

To rebut the evidence of reputation that the west half of the Appel patent was De Lancy and Dubois' land, and that such reputation was erroneous or mistaken, arising from the fact that De Lancy and Dubois had owned land in that vicinity, the plaintiff read in evidence a deed from Oliver De Lancy and Peter Dubois to John Glen, bearing date the 30th December, 1766, conveying a tract of land released to William Appel by the trustees of the township of Schenectady, adjoining to and lapping on part of the west half of the Appel patent. The plaintiff also proved that the mortgage from William Appel to Bancker and others, was sent by a grandson of Bancker to an attorney twenty years since for collection, and was afterwards delivered by one of the heirs of another of the mortgagees to C. Pioneer, one of the lessors of the plaintiff.

During the progress of the trial, the defendant objected to the competency of the evidence offered by the plaintiff as it respected the proof of the records of the Dutch church in the city of New-York, the arbitration bond, the mortgage and the deed from De Lancy and Dubois to Glen ; and the plaintiff objected to the competency of the evidence offered by the defendant as it respects the deed from Yates to Peek, and from Garnsey to Rexford, and as to the proof of the reputation of the west half of the patent being De Lancy and Dubois' land ; but the several objections were overruled by the presiding judge, and the testimony received.

The testimony being closed, the counsel for the defendant insisted that the evidence produced on the trial proved that William Appel, the patentee, in his life time, parted with the west half of the patent, and that the jury were warranted to presume that the patentee in his life time, or his executors after his death, had sold and conveyed all the right, title

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

and interest of the said William Appel in and to the west half of the said patent; and that neither of the lessors of the plaintiff had acquired any right, title or interest in or to the said west half of the said patent or any part thereof, by descent from the said William Appel; and the counsel for the said defendant did then and there pray the circuit judge, "to admit and allow the said matters so produced and given in evidence, to be legal and sufficient evidence to go to the jury to warrant them in making the aforesaid presumptions, and to entitle the said David Schauber to a verdict in his favor in this cause, and bar the said James Jackson of his action aforesaid." To this the counsel for the plaintiff objected, and his honor, the presiding judge, delivered his opinion, "that the matters so produced and given in evidence were not sufficient in law to prove, or authorize the jury to presume that William Appel, the patentee, or his heirs or legal representatives, had aliened the west half of the said patent to Delancey and Dubois, or to any other person, so as to divest the title of the lessors of the plaintiff, provided they were the legitimate descendants and heirs at law of the said patentee; but that the said several matters so given in evidence, were proper and legal evidence to be taken into consideration by the said jury, in determining the question whether the lessors of the plaintiff were such descendants and heirs at law of the said William Appel the patentee; and that, in his opinion, the evidence in the cause was sufficient to warrant the jury in finding a verdict for the plaintiff; but that was a matter of fact proper for the consideration of the jury." To which opinion and decision, and the several other opinions and decisions pronounced against the defendant, the defendant excepted. The jury found for the plaintiff.

The reasons for the decision of the supreme court denying the motion for a new trial, will be found in the opinion of the court in 7 *Cowen*, 193 to 202.

*A. Van Vechten*, for plaintiff in error, stated that the first point which he would raise for the consideration of the court was, that by the will of William Appel, the patentee, the le-

gal title to his real estate vested in his executors in trust for the purposes expressed in the will.

*L. H. Palmer*, for defendant in error, objected to the discussion of such question, contending that it was not embraced in the exceptions taken by the defendant on the trial; that the will was avowedly introduced by the defendant to lay the foundation of a presumption of conveyance by the executors; that it was not pretended at the circuit that the heir at law was divested by the will; and had such ground been assumed, the plaintiff was prepared to have proved the descent of other lessors of the plaintiff from the executors. He insisted that a bill of exceptions does not draw the whole matter into examination, but only the points to which it is taken; that the rule is, that the party must lay his finger on the points which arise, either in admitting or refusing evidence, or matter of law arising from a fact not denied, in which he is overruled by the court. (*Bull. N. P.* 316. 8 *Johns. R.* 495. 2 *Caines*, 168. 11 *Wheaton*, 276.)

*A. Van Vechten*, in answer to objection. The will was introduced to shew that the plaintiff was not entitled to recover; and if by it the estate of the heir at law is divested, this court will not give judgment for him. The will is before the court, and they will give it its legal construction. The construction of the will was a principal point discussed in the supreme court by counsel, and to it the attention of that court was chiefly directed in the opinion they pronounced in this case.

THE CHANCELLOR expressed his opinion, that the question of the construction of the will as to whether the executor took an estate under the same, could not now be agitated, as not embraced in the points presented by the bill of exceptions. The will was necessarily set forth, as part of the evidence relied on by the defendant to raise the presumption of a conveyance; and although the question as to the construction of the will had been argued and considered in the supreme court, still, if it did not legitimately arise on the bill of exceptions, this court, which could only pass upon the

questions raised at the circuit specifically pointed out by the bill, could not properly hear the discussion. Senators Benton, Jordan and Todd concurred in the opinion of the chancellor. Senators Allen, Crary, Stebbins and Throop were of opinion that the counsel for the plaintiff in error might proceed; that in the opinion pronounced by the presiding judge at the circuit that the plaintiff was entitled to recover, was necessarily involved the determination of the question that the executors did not take an estate under the will; and that opinion having been excepted to, the point now necessarily arose on the bill of exceptions; and this was the opinion of a majority of the court, (13 to 7.)

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

*A. Van Vechten.* The executors took a fee by implication of law : though there was no devise to them by express words, they were constituted by the will, trustees to effectuate the intentions of the testator, which were a sale of his estate, and a distribution of the avails amongst his four children and a grand-child, for whom the executors were created trustees until his arrival of age or marriage. The heir at law was expressly disinherited. Language cannot be more explicit than that used by the testator, of his intention that his estate should not go to him. This case is distinguishable from that of *Bergen* v. *Bennet*, (1 *Caines' Cas. in Err.* 15.) Here the executor had an interest coupled with his power to sell, being by the will entitled to one fifth of the avails to be derived from the sales. The supreme court seem to have overlooked the cases where executors empowered to sell are also trustees to fulfil the intentions of the testator, in which cases, unless they take a fee, they may not be enabled to fulfil the trust; and to enable them to do so, the law casts a fee upon them, although there is no direct devise. (*Viner's Abr. tit. Implication*, 341, *letter a. and cases there cited.* 3 *Burr.* 1684. 5 *Barnwell & Ald.* 252. 1 *Ves. sen.* 485.) In the case of *Jackson* v. *Burr*, (9 *Johns. R.* 104,) where it was holden that the executors had a naked power to sell, and that until the sale the land descended to the heir, there were no words of disinherison, nor had the executors an interest in the subject matter.

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

The jury were warranted in presuming a conveyance eith-
er by the patentee or by his executors. The executors were
not only *authorized* but *directed* to sell the estate of the testa-
tor; and the law always presumes a performance of a duty, in
compliance with a trust created. (4 *T. R.* 682. 11 *Johns.
R.* 456.) The arbitration bond admits that the executor
with the monies of the estate had purchased in a mortgage;
and the mortgage to Bancker, which the law presumes to be
paid, must have been satisfied by the executor; and whence
could he have derived funds but from the sale of the real es-
tate? The declarations of Mrs. Peltz, that all the property
she had was two houses in the city of New-York, supports
the presumption, as does also the great lapse of time between
the accruing of the title and the assertion of the claim. Since
the execution of the mortgage in 1733, not an act of owner-
ship is shewn, either by the patentee or any of his descend-
ants. In the case of *Hillary* v. *Walker*, (12 *Vesey*, 265,)
Lord Erskine says, "The presumption in courts of law
from length of time stands upon a clear principle, built upon
reason, the nature and character of man, and the result of
human experience. It resolves itself into this: that a man
will naturally enjoy what belongs to him." (See also 7 *Whea-
ton*, 109; 6 *Wheaton*, 481; 10 *Johns. R.* 380.) The de-
scendants of the patentee resided in the vicinity of this prop-
erty, permitted the occupants to subdue and cultivate the
lands and make valuable improvements, and yet asserted no
title to the premises. Their silence was treacherous and
fraudulent; and now they are not entitled to be heard. (2
*Johns. R.* 573.) The reputation that the west half of the
patent belonged to Delancey and Dubois, warranted the
presumption of a conveyance to them. Delancey and Du-
bois were attainted during the revolutionary war, and their
property confiscated. They probably took their deeds and
evidences of title to real estate with them to England, which
accounts for the non-appearance of an owner of those lands;
and if, as admitted by the supreme court, there is strong
ground in this case to presume a conveyance of the title,
there is nothing to presume an extinguishment of that title.
Presumption must be consistent with facts and circumstan-

ces ; and no facts or circumstances exist on which such presumption in favor of the plaintiff can rest.    If the jury were warranted in presuming a title out of the plaintiff, then the defendant, being in possession, though without color or claim of title, had a right to avail himself of such outstanding title to protect his possession.    (16 *Johns. R.* 197.)

*S. G. Huntington,* on same side, cited the following authorities in support of the several points raised for the plaintiff in error :  6 *Cruise,* 265, *sect.* 74 ;  2 *Bacon's Abr.* 54 ;  2 *Strange,* 798 ;  2 *Vernon,* 687 ;  *Roberts on Wills,* 431, *n.* ;  3 *Wheaton,* 224, *a.* ;  6 *id.* 504 ;  7 *id.* 59, 109 ;  8 *id.* 202 ;  495, 535 ;  10 *id.* 177, *a.* ;  *Toller,* 413 ;  1 *Brown's Civil and Admiralty Law,* 337 ;  *Adams' Eject.* 252, 3 ;  2 *Phil. Ev.* 187, 8, 149 ;  *Bull. N. P.* 171 ;  1 *Campb.* 196;  4 *id.* 34 ; 15 *East,* 294, *a.* ;  *Woodfall,* 489.

*L. H. Palmer,* for defendant in error.    The counsel commented on the evidence, and adduced a number of authorities to shew the competency and sufficiency of the proof offered to establish the pedigree of the lessors of the plaintiff, and their descent from the original patentee ; but as this question, upon the same evidence, is fully settled in the case of *Jackson, ex dem. the same lessors,* v. *King,* (5 *Cowen,* 237,) and the opinion of the supreme court upon that point not disturbed by the decision in this cause, it is deemed unnecessary to note this part of the argument.

As to the will of William Appel.    The object of the testator was to provide for the division of the avails of his property equally *among his children,* and not to devise his land *to his executors.* With this view, he gave the legacy to his heir at law, declaring it to be in satisfaction of his claims in right of primogeniture, justly considering all his children as our statute of descents now considers them, as having equal claims on their parent.    If the estate is not devised to some person, though the intention of the testator be ever so manifest to disinherit the heir, the law casts the estate upon the heir, and the land must be recovered in his name.    To give the estate to the executors, there must, at least, be words implying a devise.    A negative cannot make one.    (*Cowp.* 657.    1 *R.*

*L.* 364.) The cases where estates pass by implication in a will, seem to fall under one of the following heads : 1. Where the heir or devisee cannot take until the happening of a particular event, and the land, in the mean time, is not disposed of, as in a devise to the heir of the testator, after the death of his wife, or a devise to A, and if he dies without issue, to B. (1 *P. Wms.* 472, 4. 6 *Cruise's Dig.* 205, 6. 6 *Coke,* 16.) 2. Where an estate is devised to trustees, without words of limitation, and the trust requires a fee. (1 *Ves. sen.* 485. 2 *Strange,* 798. 3 *Burr.* 1684. 1 *W. Bl.* 543.) 3. Where lands are devised, and the devisee is personally charged with the payment of a sum of money in consequence of the devise, or where the testator charges the land with the payment of money, or other duty, and then devises the land, without words of limitation. (6 *Johns. R.* 185. *Jackson* v. *Merrill,* 18 *Johns. R.* 31. 2 *Binney,* 464. *id.* 532. *W. Bl.* 543. 3 *Burr.* 1684. 6 *Com. Dig.* 180, *tit. Estate by Devise, n.* 12, *Am. ed.*) The devise in this case does not fall under any of the above enumerated cases.

Where there is not a *necessity* for implication, the law will not raise one. Neither is *conjecture* to be taken for implication. (1 *Ves. & Beame,* 466. 6 *Cruise's Dig.* 205, 7. 6 *Com. Dig. tit. Estate by Devise, n.* 12, 13.) The power to sell is ample, and answers all the objects of the testator. There is, therefore, no *necessity, reason* or *cause* for the implication, and no benefit could result from it. The testator, by the devise of *a power,* negatives all intention to give *an estate* to the executors. The testator so considered it, because he declares that the conveyances of the estate to be made by virtue of the power, should be as effectual as if made by himself.

The distinctions and doctrines relative to naked powers and powers accompanied with trusts, are clearly stated in *Powell on Devises,* 301, 302. He states, and is supported by abundant authority, that where " *a power is given to executors to sell land and divide the money, the land, in the mean time, descends to the heir.*" He detects the error of *Toller,* and explains the cause of it, and restores the authority of *Coke Litt.* 113, *a,* and shews that the note of *Butler & Hargrave*

on this passage is unsupported by authority, and that it arose from an incorrect manuscript note of the case cited to support it. To the same effect is *Litt. sec.* 169, *Co. Litt.* 112 *b*, 113 *a*, *Powell on Devises*, 292. In the present case, John Appel had only an interest as executor in the fund to be created by the power. His individual interest was a dividend of *this fund*, and not of the *land*. In 8 *Wheaton*, 202, Ch. J. Marshall clearly draws the distinction between naked powers and powers coupled with an interest. The case of *Bergen* v. *Bennet*, (1 *Caines' Cas. in Err.* 16,) is decisive of this question, and expressly determines that the land, in the present case, descended to the heir at law.

As to the presumption of title in Delancey and Dubois. No deed to them was shewn. Had a deed been produced, it could not have been read without proof of execution, as under it no title has ever been claimed, or possession held. There was no title, no claim, no possession. The neglect of the commissioners of forfeitures to sell, and more especially the omission of hungry speculators in tory lands to call the attention of the commissioners to this property, afford a conclusive presumption that it was not considered as Delancey and Dubois' land, notwithstanding the slight rumor to the contrary. To test this question, could the state recover the premises, as confiscated property, on the evidence disclosed by the bill of exceptions ? Presumptions are freely indulged in cases of satisfied terms of years, trusts and contracts for sale of lands, where a party has a right to a release or conveyance ; and where there has been a possession and claim according to the right set up, but a link in the chain of title is wanting. In such cases, where nothing appears to rebut the presumption, a conveyance will be presumed to protect an ancient possession under claim of right. (*Buller's N. P.* 104. 1 *Esp. R.* 460, 461. *Cowper*, 214. 5 *Vesey*, 565. 2 *Burr.* 1075. 1 *Merrivale*, 114, 124, 125. 8 *Vesey*, 105, 129. 9 *Johns. R.* 180. 6 *Johns. R.* 218. 4 *T. R.* 682. 7 *Wheaton*, 59, 110, 114. 5 *Conn. R.* 310. 12 *Vesey*, 239. *Doctor & Stud.* 27. 2 *Str.* 1267. 8 *Viner's Abr.* 167, *pl.* 13. *Gilb. Ev.* 142. 10 *Wheaton*, 177, *n. a.* 16 *Johns. R*

486. 10 *Mass. R.* 403. 12 *Johns. R.* 365.) The case of *Hillary* v. *Walker*, (12 *Vesey*, 265,) relied on by the other side, is in strict conformity to the principles decided in those cases. There the *cestui que trust* had been in possession of the estate for 60 years after the object of the trust had been accomplished; but he could not shew a release from the trustees. Having a right to the release, and having been in possession for such a length of time, the law presumed that to be done which ought to have been done, viz. the execution of a release by the trustees. It does not follow, because it was made the *duty* of the executors to sell, that they did sell. The time and manner was left to their direction; and under the circumstances of the case, an omission to sell may have been entirely reconcilable with their duty. The defendant being a mere naked possessor, without color or claim of right, cannot avail himself of an outstanding title. (*Buller's N. P.* 104, 110. 3 *Johns. C.* 109. 3 *Johns. R.* 375, 386. 12 *Vesey*, 265. 4 *Johns. R.* 202, 210, 211. 3 *Wheat.* 224, n. a. 10 *Johns. R.* 381.) Lapse of time does not affect the right of the plaintiff to recover. Title and seisin are always considered united in the owner, until a disseisin. No entry is necessary to protect the title until it is separated from the possession by ouster. (*Journal of Juris.* 254. *Co. Litt.* 114, a. b.)

*J. L. Wendell*, on same side. The jury were not warranted in presuming a conveyance from the patentee or his his executors. The declarations of Mrs. Peltz, in relation to her property, would not authorize such presumption. They were not made under circumstances which required the assertion of a claim of title, nor to a party who was misled by them, or sustained an injury in consequence. To give the effect contended for on the other side to these declarations, would be to repeal the statute of frauds. (5 *Cowen*, 133, 4.) The declarations are satisfactorily accounted for by the presumption that Mrs. Peltz was totally ignorant of her rights; and if so, her declarations cannot injure her or her descendants. There is no evidence that either she or the lessors of the

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

plaintiff *knew*, until the commencement of this suit, that the defendant or his ancestor were in possession of the property, and expending money in its improvement; and unless such knowledge is brought home to them, the rule of law that a party shall be precluded by a non-claim, does not apply. (11 *East*, 374. 2 *Saund.* 175, *d. e.*) Nor can the defendant, asserting no title to the premises, avail himself of this principle, which operates only in favor of a party acting under an erroneous opinion of title. (1 *Johns. Ch R.* 354. 2 *Johns. R.* 586. 5 *Johns. Ch. R.* 184.) The lapse of time without suit is satisfactorily accounted for; the premises were not settled until 1775; during the revolutionary war, Mrs. Peltz, a widow, and upwards of 55 years of age, was driven from her home; the property had descended to her from her grand-father; it was encumbered with a mortgage to the amount of its probable value, and she most probably did not know of her right to it; she died in 1795; Mrs. Bogert was then a feme covert; and because her husband omitted to assert her title to the land, she ought not to be debarred from her right; he died in 1820, and she immediately brought her suit. A conveyance could not be presumed to the defendant or his ancestor, because the facts of the case contravene the presumption of such grant. They never asserted title to the land. On the contrary, they disavowed all claim; and it would be absurd to presume a conveyance, where the claim was not correspondent to it. A presumption cannot arise where the claim is of such a nature as is at variance with the supposition of a grant. (7 *Wheaton*, 109 to 112.) Nor could it be presumed to Delancey and Dubois. The evidence that the land was called Delancey and Dubois' land, was illegal and inadmissible. Being *hearsay*, it was of the slightest character. Even a continued reputation was not shewn. The witness who speaks of the reputation of ownership, resided in the vicinity of the land, and yet never heard any of the former occupants recognize it as belonging to Delancey and Dubois. There was such a rumor from 1780 until some time after the revolutionary war, and then it was generally spoken of as land the owners of which were unknown; and that it was so spoken of, is shewn

by proof on the part of the plaintiff.    Had the rumor of its
being Delancey and Dubois' land been supported by posses-
sions correspondent, recognizing them as the owners, then
there might have been some ground whereon to found the
presumption of a conveyance to them ; but, stript of all claim
by them, unsupported by any possession under them, there
is not a fact or circumstance in the case whereon to found
such presumption.    In the case of *The Mayor of Hull* v.
*Horner,* (*Cowp.* 102,) lord Mansfield says, the principle of
presuming a conveyance is a right one *in favor of rights*
which parties have long been in the peaceable and quiet pos-
session of ; and in the case of *Van Dyke* v. *Van Buren,* (1
*Caines,* 89,) the supreme court say, " A deed is justly if not
necessarily to be presumed, and considerations of public con-
venience and sound policy will, *under circumstances of ancient
and continued possession, by color and claim of right,* require
the presumption."    Here was not an ancient and continued
possession under claim of right, either in the defendant or in
Delancey and Dubois, and no consideration of convenience or
policy required the presumption of a conveyance.    If a con-
veyance to Delancey and Dubois could, by possibility, be pre-
sumed, it must have been made previous to November,
1767, for then John Appel, the executor, was deceased.
And it could not, in 1826, be set up as an oustanding title ;
for an outstanding title, to be availing, must be a present sub-
sisting title, one that is living and operative ; (3 *Johns. R.*
386 ; 6 *Johns. R.* 257 ;) and cannot be set up by a defend-
ant *who has no title* to defeat a plaintiff who shews a good ti-
tle ; as between them the presumption of the extinguishment
of the oustanding title is liberally indulged, (3 *Johns. R.*
386,) and a trespasser who enters upon another's *possession*
without pretence of title, is not permitted to avail himself of
such defence. (4 *Johns. R.* 211.)    *A fortiori* ought not such
defence to be supported, when it is set up against a good and
perfect title.    No presumption of a conveyance by the exec-
utors arose from the fact of the executors having money be-
longing to the estate of the testator.    Such funds did not *ne-
cessarily* arise from the sale of the real estate.    For aught

that the bill of exceptions discloses, they might have arisen from the collection of debts.

*S. A. Talcott,* (attorney general,) in reply. The lessors under whom the plaintiff claimed, having been shewn to be the descendants of *Simon* Appel, the heir at law of the patentee, cannot recover as the collateral heirs of *Johannes* Appel, the executor, without shewing that he left no heirs, or if he did, that such issue and their descendants, if they had any, are no longer in existence. (2 *Phil. Ev.* 188. 15 *East,* 293.) If, then, by the will of William Appel, the course of descent was interrupted, the plaintiff is not entitled to recover. By the will, an estate was granted to the executors. They had an interest in the property which they were authorized to sell ; each being entitled to one fifth of the avails of the sales. They were required to sell and make distribution, and to retain the share of one of the *cestuis que trust* until he arrived at age. They, therefore, took a trust coupled with an interest. The clause of disinherison of the heir should have a controuling effect in ascertaining the intent of the testator, if there be doubts as to the other provisions in the will. Suppose there was not an interest coupled with a power to sell ; the executors took a fee as necessary to enable them to fulfil the trusts, they being conferred for the benefit of others, and could not be executed unless the executors took a fee. (15 *Johns. R.* 554.) This was not a naked power. (3 *Binney's R.* 69.) The testator intended that *Simon,* the heir at law, should have nothing but what was given him by the will ; consequently, the executors were entitled to the rents and profits. The estate was taken from the heir, and vested in the executors by necessary implication.

Although one of two executors renounces the execution of a will, the other may perform the trusts created by it, where by the will they are constituted trustees as well as executors. (14 *Johns. R.* 391. 1 *Mass. R.* 60. 2 *Mass. R.* 535. 3 *Munford,* 349. 4 *id.* 341. 14 *Johns. R.* 553.) And so, though one of two executors to whom power is given by a will to sell lands renounces the executorship, he may still legally execute the power to sell. (*Wheaton's Dig.* 279. 14 *Johns. R.* 557. 15 *Johns. R.* 347.) It was the duty of the

executors to sell, and the law will presume they performed the trust reposed in them; for where an act is required to be done by one, the omission of which would make him guilty of a criminal or culpable neglect of duty, the law presumes the affirmative. (3 *East,* 192. 19 *Johns. R.* 347.) Besides, it was the interest of the executors to sell.

The lapse of time without claim affords ground for the presumption that the heirs considered themselves divested by the execution of the power in the will. The declarations of Mrs. Peltz are to the same effect. It was generally reputed as the land of Delancey and Dubois, who were attainted during the revolutionary war, and who probably carried away their title deeds. (1 *R. L.* 128.) Reputation of forfeiture has been held sufficient to sustain a recovery of confiscated estates in the cause of *Jackson* v. *Randall,* not reported. Here was not only parol but written proof of reputation.

If the power can be presumed to have been executed, then there is no ground for saying that the title may have been extinguished. Lapse of time alone would not warrant a presumption of extinguishment. If it could, it would destroy the plaintiff's claim. A title cannot be extinguished where the whole estate is conveyed. An extinguishment does not revest an estate which has been parted with by conveyance. It is only in cases of trust estates and the like, where this principle applies.

It is said an intruder cannot set up an oustanding title. Admitting it to be so, it does not preclude the defence in this cause. The defendant here was not an intruder. He did not, as in the case of *Jackson* v. *Harder,* (4 *Johns. R.* 211,) enter upon the possession of another by intrusion, in which case it ought not to be permitted to a defendant to avail himself of an outstanding title. The entry here was peaceable and not tortious; and the defendant, therefore, may set up the title of Delancey and Dubois. (16 *Johns. R.* 197.)

THE CHANCELLOR. This court having decided that the construction of the will of William Appel is properly before them on the bill of exceptions, the first question for consideration is, whether by that will the real estate was devised to the executors or descended to the heir at law, until they di-

vested his estate by the execution of the power to sell and distribute the proceeds.

Being perfectly satisfied with the reasoning of the chief justice in the court below on this point, and which is supported by the decision of the former judges of the supreme court, in *Jackson* v. *Burr*, (9 *Johns. Rep.* 104,) I shall not attempt to review the authorities at large on this question.

This case is not properly likened to those which frequently arise upon the construction of wills, on the question whether a fee is devised or only an estate for life. In most of those cases, there can be very little doubt of the intention of the testator to devise the inheritance ; but that intention is frequently frustrated by the carelesness or ignorance of those who prepare testamentary papers, in omitting the ordinary words which are considered necessary in law to create a perpetuity. In all such cases, the anxiety of courts to carry into effect the intention of the testator, induces them to seize hold of any expression or provision in the will which may be considered evidence of an intention to convey a fee. Thus the words *forever, all my estate, all my right, all my property,* and others of similar import, have been considered sufficient to carry the whole interest of the testator to the devisee ; and for the same reason, a charge upon the person in respect of the estate, as the payment of debts or legacies, has been considered sufficient to carry the fee by implication. But notwithstanding this strong leaning of the courts in favor of the devisee, and the reasonable presumption that the testator intended to give an estate of inheritance, cases have frequently occurred where there was not sufficient in the will to take the case out of the rule of law, that all the estate which is not legally and sufficiently devised to some other person must go to the heir, whatever may have been the intention of the testator. Thus in *Denn, ex dem. Gaskin,* v. *Gaskin,* (*Cowper's Rep.* 657,) where the testator gave his heir at law a disinheriting legacy, and then devised his lands to his nephews, but without any words of perpetuity, it was held that they only took a life estate, and that the fee descended to the heir. And Lord Mansfield and Mr. Justice Ashurst declared that although the intention to disinherit the

heir was ever so apparent, he must of course inherit unless the estate was given to somebody else.

In some cases, also, of executors and trustees, a devise in fee by implication has been allowed, where the general objects of the will could not otherwise be carried into effect, and where it was evident that the testator intended they should have such estate. (*Oates* v. *Cook*, 3 *Burr*. 1684. *Jackson* v. *Martin*, 18 *Johns. Rep.* 31.) But there cannot be the same reasons to induce the court to seek out some particular expression in the will for the purpose of giving the estate to the executors by implication, where the intention of the testator, as to the final disposition of his estate, can be carried into effect under a power of sale, as well as under the devise to the executors; and the first is recommended as the better method of disposing of the estate by will.

In this case there was no direct devise of any part of the legal estate to the executors; they had a naked power to sell the estate and distribute the proceeds. It was not necessary to have the title to the estate to enable them fully to carry into effect the intentions of the testator. If the legal estate descended to the heir, it would be divested the moment they executed their trust. The testator undoubtedly intended that his oldest son should have no advantage over his other children by right of primogeniture; and he effectually provided for this by authorizing and directing a sale of the property by the executors, and an equal division of the proceeds of the sale; but probably he thought it was also necessary, agreeable to the common notion, to give to the heir at law a disinheriting legacy. This was not necessary; and there being no good devise of the legal estate, either to the children or to the executors, it could not prevent the descent of the estate upon the heir at law, who, in such cases, holds the same in trust for those entitled to the proceeds thereof under the will until the execution of the power of sale.

The next question is as to the evidence of the pedigree of the lessors of the plaintiff below. The evidence on this subject was the will of William Appel the patentee, made in 1729, and proved in 1733, in which he describes his son Simon as his heir at law, and gives him a disinheriting lega-

cy, and also names John, Mary Magdalena and Engeltje, as his children, and Jacobus Berry, as the son of his deceased daughter Helena ; the records of the Dutch church, which prove the baptism of Simon, son of William Appel, in 1695 ; of Magdalena, daughter of Simon Appel, in 1719 ; of Gertrude, another daughter of Simon, in 1721 ; and the marriage of Magdalena Appel to Abraham Peltz, in 1743 : the testimony of Elsie Van Dusen, who knew Magdalena Appel before her marriage, and who proved Mrs. Bogert, one of the lessors of the plaintiff, to be her grand-daughter, and William Green, another lessor, to be the son of her sister Gertrude ; and the will of Magdalena Peltz, by which all her estate is devised to Peggy Bogert. The recitals in the arbitration bond of 1767, the conveyance of the east half of the patent to Hagedorn, and the mortgage to Reneaudet and others, were also in evidence ; and the signatures of William Appel to the will and mortgage were submitted to the jury for their inspection. To rebut this evidence, the defendant was permitted, under a previous decision of the supreme court in the same cause, to show the situation of the lands ; the time they had been possessed and improved ; the reputation in the neighborhood as to the ownership of them ; the manner in which they were described in conveyances of adjoining lands ; and the opportunities the lessors had to litigate their title, or take possession of the land, if they were the real heirs at law of the patentee. On this testimony the question of pedigree was submitted to the jury, to decide upon as a matter of fact ; and they were told they might take into consideration, in deciding that question, the several matters given in evidence by the defendant to rebut the plaintiff's evidence of pedigree. I am satisfied, on a review of this subject, that there was sufficient evidence of pedigree not only to warrant the jury in finding a verdict for the plaintiff, but also to have induced the court to set aside the verdict, as against the weight of evidence, if they had found otherwise.

The only remaining question, and the most important one in this case, is whether there was any evidence which would have warranted the jury in finding that the patentee, or his executors, or heirs, had divested themselves of the title to

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

the lands acquired under the patent. The patentee must have died in 1738, or previous thereto. There is very little probability that he ever sold or conveyed the lands, unless the mortgage given by him thereon, in 1733, can be considered such a conveyance. There is no doubt that deeds, patents, judgments, and even acts of parliament, may be presumed to support the long and uninterrupted possession or enjoyment of a right or claim of right. But I am not aware of any case in which a conveyance has been presumed, to defeat the claim of a person showing a good paper title, unless there had been an adverse possession or enjoyment under claim of right and in accordance with the fact presumed. In *Kean* v. *Dearden*, (8 *East's Rep.* 263,) Lord Ellenborough, C. J., in relation to a presumption of a re-conveyance, says, " Presumptions of this sort, when fit to be made, are always made in favor of the possession of those who are rightfully entitled to it. The rule of presumption is *ut res rite acta est*, and is applied whenever the possession of the party is rightful, to invest that possession with a legal title." And in the same case, Le Blanc, J. says, " Such a presumption may be made where it is necessary to clothe a rightful possession with a legal title; but the court must first see that there is nothing but the form of a conveyance wanting." In *Eldridge* v. *Knott & others*, (*Cowp.* 214,) it was held that the mere neglect to enforce the payment of quit-rents against the tenant, for any time short of the 50 years fixed by the statute of limitations, was not sufficient to support a presumption of a release or extinguishment of the rent. There are two kinds of presumption in favor of a grant or conveyance of real estate. The one is in favor of those who are entitled to a conveyance from trustees or others, in conformity to the trust, or in pursuance of some contract or agreement to give such conveyance. In such cases, a jury, after a certain lapse of time, may presume the execution of the trust, or a conveyance of the title in pursuance of such agreement; and a person in possession, without right, will not be permitted to defend himself on the ground of an outstanding title. The other is in favor of a person who is in possession of property, or in the enjoyment of some privilege or easement un-

der claim of right ; in which case, under certain circumstances, and after a great lapse of time, a conveyance of the land, or a grant of the privilege, or easement will be presumed, on the principle of quieting the title or possession. This presumption is founded upon the supposition that a man will enjoy what he is entitled to, and will not permit others to interfere with his rights without objecting ; and it may always be rebutted by showing that the possession held, or privilege exercised, was perfectly consistent with the right or interest of the party who afterwards sets up an adverse claim. (*Daniel* v. *North*, 11 *East's Rep.* 372.) But this presumption in favor of a grant, and against written evidence of title, can never arise from the mere neglect of the owner to assert his rights, and where there has been no adverse title or enjoyment by those in whose favor the grant or conveyance is to be presumed ; and for the obvious reason, that the presumption against the person showing title, which arises from the delay in asserting his title, is equally balanced by the like presumption, arising from the same delay on the part of the supposed grantee.

In this case, the presumption that the executor conveyed in pursuance of the power contained in the will, is rebutted by the fact that the executor took upon himself the execution of the will more than forty years before the attainder of Dubois and Delancey, and died at least twelve years before that event, and yet no person ever exercised any acts of ownership over the property, or made any claim under a conveyance from the executor during that period of time. If any legal presumption of title in Dubois and Delancey could be raised from the public report that they were the owners, and from the description of boundaries in deeds of adjoining lands about the time of their attainder, that presumption is rebutted by the circumstance that the state never made any claim to the land, although it lay within a few miles of Albany, and almost under the eyes of the commissioners of forfeiture ; and therefore the reasonable presumption on the other side is, that the commissioners investigated the subject, as their duty required, and found there was no such title. And the presumption that William Appel, or his heirs at law, have

parted with their title, which arises from the neglect to assert it for nearly ninety years, is rebutted by the fact that during all that time no person has been in possession, or claimed title to the land under the supposed grantee, or otherwise.

I am inclined to think the mortgage given by the patentee shortly before his death has been the cause of the obscurity in which this subject is involved; and if it had not been found in the possession of a descendant of one of the mortgagees, I might have supposed that Dubois and Delancey had obtained that mortgage by assignment, which would have accounted for the rumor of their title. This deed of June, 1733, to Reneaudet and others was in fact a mortgage, because the grantor was entitled to redeem by paying the mortgage money and interest within one year from its date; yet it contained all the usual requisites of an ordinary conveyance, such as covenants of seisin and of warranty, and for quiet enjoyment, clearly and absolutely acquitted and discharged, if default should be made in payment of the mortgage money, and for further assurance. When John Appel took upon himself the execution of the will, the time of payment had expired, and the amount of the mortgage money and interest then due was probably the full value of the land at that period, in its wild and uncultivated state. These circumstances may account for the neglect of the heirs to assert their title to the land at that time, and of the executor to sell it under the power contained in the will. The subsequent death of those who were acquainted with the true state of the title, and the loss and destruction of papers during the turmoil of the revolution, may account for the neglect of the heirs to assert their title since.

Whether that mortgage ever was paid, it is not material now to inquire. A stranger, in possession without right, is not permitted to set it up as an outstanding title; and there having been no possession under the mortgage, or admission of the indebtedness for so long a period, it may now be considered as extinguished.

I am not at liberty to express any opinion as to the real state of the facts in this case, which is not founded on the

testimony adduced at the trial. Knowing that many of the settlers on this tract have spent the best part of their lives there, and made valuable improvements, under a belief that no owner would ever come to assert his title to the land, I cannot but regret the result to them, if my views of the law of this case should be concurred in by a majority of the court. But I must not allow my sympathy for either party to bias my judgment in any case, and particularly when deciding important legal principles, the effects of which may be extensive in their operation. I am satisfied there was no evidence which could legally authorize the jury to presume a conveyance from the patentee or his legal representatives to the defendant, or any person under whom he claimed, or even to a stranger. I am therefore of opinion that the judgment of the supreme court should be affirmed.

OLIVER, Senator. The recovery in this cause by the plaintiff below, if sustainable, must rest upon the title set up in the lessor Peggy Bogert, as devisee of Magdalena Peltz, one of the daughters of Simon Appel, the heir at law of William Appel the patentee, and in the lessor William Green, as heir at law of Gertrude, the other daughter of Simon Appel, which said Magdalena and Gertrude, the plaintiff below alleges, were the only children of Simon Appel; for the evidence in the case does not make out any pretence of title in any of the other lessors.

It appears that the patent in which the premises in question are comprehended, was granted in 1708 to William Appel, in trust as to one half for the heirs of Harmanus Hagerdorn; and that in 1713, the patent was divided by a northerly line from its south boundary at the Mohawk river, through the middle to its north bounds, and the east half released by Appel to the heirs of Hagerdorn, and the west half retained by himself in severalty; that the east half has ever since been held and occupied by or under the Hagerdorn title; and that no act of ownership on the west half has been exercised by William Appel or his heirs since the division, except the following, to wit: In 1733, Appel executed a mortgage thereof to Bancker and Rutgers, to secure the payment of

£108 10s., with lawful interest in one year; but it is not shewn that the mortgagees ever in any manner enforced the mortgage, or that the mortgage money has been paid; on the contrary, it is proved that the mortgage was found not many years since, among the family papers of one of the mortgagees. It further appears, that in 1729, William Appel duly made and published his last will, by which he gave and bequeathed to his son, Simon Appel, a pecuniary legacy of *twenty shillings for his birth right,* and declared his intent thereby utterly to debar him of any other or further pretence or claim whatsoever to his real estate as heir at law; and to his son Johannes he gave and bequeathed a pecuniary legacy of £25, to be raised out of his real and personal estates; and after several specific bequests out of his personal property, he authorized, empowered and directed his executors to grant, bargain, sell and dispose of all his real and personal estates, (except so much of the latter as he had specifically bequeathed,) within such time, and in such manner, either at public vendue or otherwise, as the executors should deem necessary and convenient; and ordered that the monies arising from such sale should be applied by his executors as follows, to wit: first to the payment of the pecuniary legacies, and then the one fifth part of the overplus to be paid to each of his sons, Simon and Johannes, and to each of his daughters, Mary, Magdalena and Engeltje, and the remaining fifth part retained by his executors for his grandson, Jacobus Berry, the son of his deceased daughter Helena, until he should attain the age of twenty-one years; and he appointed his son Johannes and his daughter Engeltje the executors of his said will. It further appears that Engeltje, on the 9th of August, 1738, renounced the executorship, and Johannes, at the same time, procured the will to be proved, and sued out letters testamentary; that Magdalena Peltz, after the death of her husband in May, 1795, duly devised all her real and personal estate to the lessor, Peggy Bogert, the wife of Gerrit Bogert; and that Magdalena Peltz's father died prior to the revolutionary war; that she, during that war, resided in the city of Albany, and often spoke of her property to Elsie Van Dusen, one of the witnesses for

the plaintiff in the court below, and told the witness that all the property she had was two houses in the city of New-York, from which she received rent. It also appears, that the Appel patent is situate in the county of Saratoga, at a distance of about sixteen miles from the city of Albany; and that Gerrit Bogert, the husband of the lessor, Peggy Bogert, was a lawyer by profession, and practiced as such several years in the city of Albany, until his death in March, 1820; that the lessor, William Green, has resided in the county of Saratoga upwards of twenty years previous to the trial of this cause, and was then about 84 years old; and that his mother died during his infancy. It further appears, that William Appel the patentee had, in 1708, seven children, and that there were two William Appels, the one a *vintner* and the other a *victualler*; and that the one had a wife named Magdalena, and the other had a wife named Remerigh. It does also appear by a deed read in evidence by the plaintiff below, dated in December, 1766, that Oliver Delancey and Peter Dubois claimed and conveyed in fee to John Glen, a triangular piece of land which had been conveyed by the trustees of Schenectady to William Appel, situate along the west bounds of Appel's patent, and extending nearly across the west half thereof at the Mohawk river; and it appears that Magdalena Peltz, in 1767, entered into an arbitration bond with one Nicholas Killman, the condition of which recites, that John Appel had mortgaged to Killman a dwelling house and lot in New-York, to secure the payment of £50 with interest; that Killman had brought an action of ejectment for the house, in which Magdalena Peltz had procured herself to be made defendant, insisting in behalf of herself and others claiming under the will of William Appel, (except the said John Appel,) that by virtue of the said will, the mortgaged premises belonged, in the whole or in part, to the said Magdalena Peltz, and those for whom she insisted as aforesaid, either by lawful or equitable right; and that the said John Appel obtained the said premises by purchase, with money belonging to himself, and the said Magdalena Peltz and others claiming under the will of the said William Appel. It further appears, from the evidence on the part of

the defendant in the court below, that the west half of Appel's patent has been laid out into separate farms, and the farms generally have been so held and enjoyed by different occupants betwen 40 and 50 years, and are in a high state of cultivation ; and that the west half, after the revolutionary war, was commonly called and reputed in the neighborhood, the lands of Oliver Delancey and Peter Dubois, and is described in several conveyances of land situate in the east half of the said patent, bounded on the west half as the lands of Oliver Delancey and Peter Dubois ; that the defendant's father entered into possession of the premises in question upwards of 50 years ago, and died in possession about 20 years prior to the trial, and was succeeded by his son, the defendant in the court below, who has continued in possession ever since ; and that the father and son have made large, permanent and valuable improvements thereon ; that the father, about forty years ago and upwards, made diligent but unsuccessful inquiries to discover the owner or owners of the west half of the said patent, with the declared intent of purchasing the premises which he occupied.

By the confiscation law, passed in 1779, Oliver Delancey and Peter Dubois were convicted of treason for adhering to the enemy, and their estates forfeited, and they forever banished from this state.

Upon this evidence, the circuit judge charged the jury that the defendant had not proved sufficient to raise a legal presumption that the patentee, or his legal representatives, had aliened the west half of Appel's patent to Oliver Delancey and Peter Dubois, or any other person, so as to divest the title of the lessors as heirs at law of the patentee, if they were such ; and that in his opinion there was evidence sufficient to entitle the plaintiff to a verdict.

To this charge the defendant's counsel below took a bill of exceptions, and the jury found a verdict in accordance with the charge. The supreme court have sustained the charge of the circuit judge, and the cause is brought up by a writ of error to this court, to have the judgment of the supreme court reversed.

The counsel for the plaintiff in error contended that the circuit judge erred in his charge to the jury : 1. Because it was not sufficiently proved that the lessors of the plaintiff below, or any of them, were the heirs at law of William Appel the patentee ; 2. Because by the will of William Appel, who the said lessors allege was the patentee, his real estate vested by implication of law in his executors, from whom the lessors have deduced no title to the premises in question ; 3. Because the circuit judge did not submit it to the jury, upon the facts and circumstances proved at the trial, to presume that William Appel in his life time, or his executors under the power contained in his will, had sold and conveyed his title to the premises.

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

I shall consider each of these points thus presented, in the order above stated.

1. I deem it manifest from the evidence detailed in the bill of exceptions, that there were two William Appels in the city of New-York, the one a *victualler* and the other a *vintner ;* and that the one married a wife named Remerigh, and the wife of the other was named Magdalena ; and the patentee had seven children, and the other had only five children. The plaintiff below, by his own evidence, shews that the latter was the William Appel whose heirs his lessors claim to be ; and he has produced no proof that the children of their ancestor were reduced by deaths from seven to five, which is the number recognized in his will, or that he was both a victualler and a vintner, or that he was twice married, once to a woman named Remerigh, and once to a woman named Magdalena. This evidence, in a case of so stale a claim as the lessors set up, and one so utterly irreconcileable with their long silence, and the declaration of Magdalena Peltz, (through whom they endeavored to make out a title,) to Elsie Van Dusen during the revolutionary war, that all her property consisted of two houses in the city of New-York, and with the inattention of Gerrit Bogert, a practising lawyer in the city of Albany, and the husband of the lessor Peggy Bogert, the sole devisee of Magdalena Peltz, to the lands in question, situate not more than sixteen miles from his residence, from 1795 till his death in

1820, is not sufficient, in my opinion, to establish the title by descent from the patentee which the lessors set up.

2. That by the will of William Appel, produced by the plaintiff below, the real estate of the testator passed by implication of law to his executors. I do not mean to impugn the doctrine that a naked power given to executors to sell lands does not vest the legal estate in them. But I consider the power conferred by the will in question, to be coupled with an interest in the executors, as well as a trust to be executed by them ; for they were not merely to sell and divide the proceeds of the sale among other persons, but they were to share in the division thereof, and to retain one fifth in trust for the benefit of the testator's grandson, until he attained the age of twenty-one years. Hence, the moment the will was proved, and letters testamentary sued out, the executors became responsible as trustees for the income of the real estate until sold, and the avails thereof when sold ; and for the purpose of clothing them with adequate powers to fulfil their trust, they took the legal estate in trust, by implication of law under the will. This doctrnie is fully supported. (*Viner*, tit. *Implication*, 341. *Oates* v. *Cook*, 3 *Burr. Rep.* 1684. 5 *Barn. & Ald.* 252. 1 *Ves. sen.* 485. *Denn* v. *Garkin, Cowp.* 657. 1 *Caines*, 84. 1 *Taunt*, 279. 4 *Burr.* 1963.) Indeed it is in my judgment the only sound doctrine applicable to this case, and accords with the undisputed rule of law, that wills are to be construed conformably to the intent of the testator. Here his intent is clearly and pointedly expressed, that his heir at law, as such, should be debarred from any claim or pretence to his real estate ; and for that purpose a disinheriting legacy was bequeathed to him, to be paid by the executors. How, then, could the legal estate pass by descent to the heir, without directly violating the plain meaning and directions of the will ? Was it necessary that it should so pass, in order to carry into effect any of the provisions of the will ? Surely not ; for vesting the legal estate by implication of law in the executors, places the entire control in the hands of persons to whom it was the declared intent of the testator to confide the disposal thereof, to the use and purposes directed by his will, without infringing the

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

legal or equitable rights of any person beneficially interested therein. But the construction adopted by the supreme court seems to me directly to contravene the plain language and obvious meaning of the testator, and produces this manifest absurd result : the will constitutes the executors trustees to pay out of the proceeds of the sale of the real estate the pecuniary legacies, and one fifth of the overplus to each of the testator's children, (including the executors and heir at law,) and the other fifth to his grandson when he should attain the age of twenty-one years ; and the law makes the heir the depository of the legal estate, for the fulfilment of the trusts which are wholly confided to the executors. (1 *East*, 200.) Is it possible that there exists any artificial unbending rule of law, which constrains this court to sanction such an absurdity ? I have not been able to find any such rule, and am clearly of opinion that the lessors of the plaintiff below have no pretence of title to the premises in question by descent from William Appel the testator, and that the circuit judge should so have charged the jury.

3. The facts and circumstances proved in this case, appear to me very strong to warrant the legal presumption that if William Appel, the testator before mentioned, was the patentee of Apple's patent, he in his life time, or his executors after his death, have parted with and released his title to other persons. The facts and circumstances to which I allude are, 1. That no original muniments of the title thereto have been produced, nor has the non-production thereof been in any manner accounted for by the lessors of the plaintiff in the court below, who claim the title by descent from the patentee. This omission on their part is a just ground of presumption that their claim is not well founded. 2. That no act of ownership by the patentee, or the lessors, or any of their ancestors, is proved during the period of about ninety years ; but on the contrary, it is proved that Magdalena Peltz, one of the two co-heiresses of Simon Appel, the heir at law of William Appel, through whom the lessors claim by descent, in the revolutionary war disclaimed owning any

real property, except two houses in the city of New-York; and that Gerrit Bogert, a practising lawyer in the city of Albany, at the distance of less than sixteen miles from Appel's patent, and the husband of the lessor Peggy Bogert, the general devisee of Mrs. Peltz, never asserted his wife's claim from the time her title accrued, in 1795, until his death in 1820, when the west half of the patent was actually possessed and cultivated by strangers. The nature and character of man is to seek to enjoy the property to which he has a valid title ; and hence arises the legal presumption from his not doing so for a great length of time, that he has no existing title to the property which he thus leaves in the enjoyment of others. This presumption is fortified in the case of a professional man, whom the law deems more cognizant of his legal rights than other men. 3. That the east half of the patent has been held and occupied by and under the Hagerdorns, the *cestuis que trust* mentioned in the patent, since the division in 1713. If, therefore, the lessors of the plaintiff in the court below acquired a title by descent from the patentee, it is a fair inference that the original patent passed and descended to them with the land ; and as this disclosed the interest of the Hagerdorns, it is incredible that the heirs of Appel, if his title continued, would not long since have availed themselves of the means of information which the Hagerdorns possessed, to ascertain the situation of the west half of the patent, and to avow their title to it to the occupants, who were making anxious inquiries for the owners in order to purchase from them. 4. That the west half of the patent has been generally reputed and recognized about sixty years since in the neighborhood, and by the owners of the east half, to belong to Oliver Delancey and Peter Dubois, whose estates have been forfeited by an act of attainder, passed in 1779, and they banished from this state. This general reputation and recognition, taken in connection with the non-claim of the heirs of Appel during the period last mentioned, until the commencement of this suit, in 1820, establishes the presumption that the title had passed out of Appel and his heirs. 5. That the will of Appel made it the duty of his executors, as well as their interest and the interest of all his

children, including the heir at law, to sell the lands in ques-
tion; for it constituted the executors trustees to sell, with
directions to pay out of the proceeds of the sale a disinherit-
ing legacy to the heir, and a pecuniary legacy to one of the
executors, and to distribute the overplus, to wit, one fifth part
thereof, to each of the testator's children who were living,
and to retain the other fifth in trust for the son of his deceas-
ed daughter, until he should attain the age of twenty-one
years. Hence both duty and interest conspired to induce
to an early sale, in order to distribution of the avails among
the children and grandson. Thus circumstanced, the law
presumes, and every motive which usually stimulates to hu-
man action enforces the presumption, that the executors
have fulfilled their trust. Nor is there any evidence before the
court to weaken this presumption; but on the contrary,
there is a total absence of proof of even a murmur from
any quarter against the executors for the non-execution of
their trust powers; and besides, the recital in the arbitration
bond between Mrs. Peltz and Killman asserts that Johan-
nes Appel, the executor, had money which belonged to the
*cestuis que trust*, which he could have obtained only from the
sale of the trust estate, inasmuch as it is not pretended that
the testator left any money.

These facts and circumstances which I have detailed, in
my view of this case, warrant a conclusive legal presumption
that the patentee's title has long since been sold and con-
veyed, either by himself or his executors, pursuant to the
powers contained in his will. (7 *Wheaton*, 109.    6 *id.* 481.
12 *Ves. jun.* 265.    10 *Johns. R.* 378.)    And it must be re-
membered, that though this presumption might have been re-
butted by evidence explanatory of those facts and circum-
stances, and accounting for the non-claim of the lessors of
the plaintiff during so long a time, yet no such explanation
has been attempted on their part.

But the supreme court, in their opinion, assume certain
positions which it may be proper for me breifly and respect-
fully to consider.

The first is, that the plaintiff in error does not hold under
any claim of title, and therefore the doctrine of presumption

is not available to him. Neither the authorities referred to by the supreme court, or their reasoning, in my judgment, sustain the position : the former do not apply to a case like the present, and the latter is in direct collision with the well settled rule of law, that a plaintiff in ejectment must recover upon the strength of his own title. (1 *Burr.* 119, 126. *Runnington on Eject.* 234, 291. 4 *Johns. R.* 483. 10 *Johns. R.* 368.) According to this rule, the defendant cannot be ousted of his possession unless the adverse party proves a subsisting, paramount, legal or possessory title to the premises ; but if the defendant shews facts and circumstances from which the law authorizes a jury to presume that the plaintiff's title has been released, where is his subsisting paramount title ? Or suppose the plaintiff produces and proves a *prima facie* regular paper title, and the defendant shews conclusively that the whole claim of title is a forgery, is this unavailable to him, because he is a naked possessor ? Is not his possession good against all the world except the legal owner ? Has it ever been questioned that a defendant in ejectment, though a naked possessor, (and especially one whose possession has endured 50 years without any adverse claim, and has been followed by progressive and valuable improvements,) may defend himself by shewing that the plaintiff has sold and conveyed his right to the premises to a third person, before the commencement of the action ? I apprehend not. What then is the difference in principle, whether the defendant proves directly such conveyance, or proves facts and circumstances from which a jury are authorized, and of course required by law to presume it.

It has been said that the doctrine of presumption is admitted only in favor of possessors claiming right; but I ask, where is this distinction to be found, and on what principle of law is it sustainable ? Has not the possessor the best title as between him and a plaintiff in ejectment who does not shew a subsisting paramount title ? and if he has, is he to be ousted of his possession because the plaintiff once had a paramount title, with which he has long since parted ?

The next position of the supreme court is, that the presumption against the lessors of the plaintiff is not avail-

able, because the plaintiff in error has not shewn to whom the Appel title has been sold and conveyed. Can this be sound law? The rule of presumption is admitted, because, from the lapse of time, no direct evidence of the conveyance is deemed to be obtainable; for otherwise, it is wholly inadmissible. But here is strong presumptive evidence of a conveyance to Delancey and Dubois, without any color of evidence to rebut it, except the absence of proof of any act of ownership by them over the lands in Appel's patent, since their conveyance in 1776 to John Glen. How stands this supposed chasm in the evidence on the part of the plaintiff in error? It appears that the west half of Appel's patent remained in a wild state until about 50 years before the trial. The revolutionary troubles commenced in a few years after the date of the above conveyance. In the war which those troubles produced, Delancey and Dubois adhered to the enemy, and in 1779 were attainted by a legislative act, and banished from the state. This accounts fully for the absence of proof of any acts of ownership on their part during the turmoil of the revolution; and prior to their attainder and banishment, no such acts were to be looked for in those times, because it was not their interest to avow their ownership, inasmuch as that might have tended to produce what afterwards happened, the forfeiture of their estates; and after their attainder and banishment, they had no motive for intermeddling with the premises.

The last position of the supreme court seems to be, that from the lapse of time and the absence of proof of ownership by any grantees of Appel's executors, it may be presumed that the right of such grantees (if any there have been) is extinguished. This position, I apprehend, is wholly untenable; for the executors were authorized and required to sell and convey in fee, and if they have so sold and conveyed, I cannot imagine how the title could be extinguished so as to produce a reversion to the heirs of Appel. The doctrine of extinguishment, when applied to a mortgage or lease, is perfectly intelligible; for when the mortgage is satisfied or lease surrendered, the fee reverts by operation of law, in the one case to the mortgagor or his heirs, and in the other to the les-

sor or his heirs. But though the estate of an absolute gran-
tee in fee may revert for lack of heirs capable of inheriting,
it can revert only to the state by way of escheat. If the es-
tate of the patentee was conveyed by his executors, his heirs
can never regain it except by a new purchase. Is there any
evidence of such purchase, or from which it can be presumed
in this case? Certainly not; for all the facts and circum-
stances which establish the presumption of a sale and con-
veyance of the estate from Appel and his heirs, rebut the
presumption of any valid title in the lessors of the plaintiff
below; and besides, the lessors' own evidence rebuts it, in-
asmuch as they set up a title by descent from the original
patentee.

The result of my opinion upon the whole case is, that the
circuit judge erred in charging the jury that there was not
sufficient evidence before them to prove or warrant the pre-
sumption that the heirs of Appel had been divested of their ti-
tle by any kind of alienation, and that the evidence was suffi-
cient to entitle the lessors of the plaintiff to a verdict; and
therefore I am for reversing the judgment of the supreme
court.

STEBBINS, Senator. The lands in controversy in this
cause are situated in the county of Saratoga, and are part
of a tract granted by letters patent to William Appel in 1708.
The father of Schauber, the defendant below, entered upon
the premises when in a wild state, about half a century since,
without any claim of title, and frequently acknowledged that
the owner was unknown to him, and applied to others for in-
formation in regard to the title, for the avowed purpose of
purchasing. Not being able to find in whom the title was vest-
ed, he continued clearing and cultivating the land, building
upon and improving it until his death, and then transmitted his
possession to his son, the defendant below. The plaintiffs
below claimed title as the descendants and heirs of William
Appel, the patentee, through his eldest son and heir, Simon
Appel.

The cause comes up upon a bill of exceptions taken at the
circuit, by which it appears that the question of pedigree was

submitted to the jury, and that exceptions were taken to the competency of the testimony and the charge of the judge upon that point.

The defendant, to shew that the plaintiffs were not entitled to claim the premises by descent from William Appel, introduced his will, bearing date in 1729, by which he bequeathed to his son Simon twenty shillings for his birth-right, to be raised and levied out of his estate, wherewith he utterly excludes, debars and precludes him from having or claiming any other or further pretensions, claims and demands whatsoever, as being his heir at law, or by any other pretence whatsoever. He then bequeathes certain articles of personal property to other children, and £25 to his son Johannes, to be raised out of monies arising from the sale of his real and personal estate. He then authorizes, empowers, orders and directs his executors to sell and dispose of his whole real and personal estate, as well in New-York as elsewhere, (except the personal estate before bequeathed,) either at public or private sale, and declares their conveyances valid and effectual to convey all his estate. He directs the monies arising from such sale to be applied, first, to pay the legacies, and the balance to be divided, one fifth to each of his sons Simon and Johannes, one fifth to each of his daughters Magdalena and Engeltje, and one fifth to his grandson Jacobus Berry, the share of the grandson to be retained until his maturity or marriage in the hands of the executors, and in case of his death, to be divided among the four children above named. He then appoints his son Johannes and daughter Engeltje executors of his will. On the 9th of August, 1738, Engeltje filed her renunciation as executrix, and the will was proven and letters testamentary granted to Johannes.

According to the English law in force at the time of the death of William Appel, the patentee, his eldest son Simon, under whom the plaintiffs below claimed, would have been entitled to the estate in question as heir of his father, unless the descent was broken by or under the provisions of this will. But although the plaintiffs below may have established their heirship through Simon Appel, by competent testi-

mony, they were not entitled to recover, if by the will the estate was devised to any other person than Simon, or if it had been conveyed to any other person by the executors, pursuant to the power contained in the will, provided the defendant was in a situation to avail himself of such defence.

The bill of exceptions sets out the testimony at length, and states that the judge declared his opinion that the evidence was not sufficient to *prove* or authorize the jury to *presume* that William Appel, the patentee, or his heirs or representatives, had aliened the premises in question to any person, so as to divest the title of the lessors as heirs, provided they were such; but that the evidence was proper to be considered by the jury in determining whether the lessors were such heirs, and that in his opinion, the evidence was sufficient to warrant the jury in finding a verdict for the plaintiff, but that was a matter of fact proper for their consideration. The defendant excepted to this opinion, and the jury found a verdict for the plaintiff, upon which the supreme court have rendered judgment.

In entering upon the investigation of the merits of this cause, a serious embarrassment arises from the manner in which the bill of exceptions is framed. Instead of confining an exception to a single point of law, as is its legitimate office, the loose practice seems latterly to have grown up, of spreading the whole testimony upon the record, then representing the judge as using some general expression in his charge going to the whole merits of the cause, and excepting to that opinion. This practice has lately met the severe animadversion of Ch. J. Marshall, in 11 *Wheaton*, 276. He says, " To bring all the testimony offered at the trial of a cause at common law, instead of facts, into this court, by bill of exceptions, or otherwise, is a practice which, to say the least, is extremely inconvenient. Its tendency is to convert this court from a tribunal for the decision of points of law into one for the investigation of facts, and for weighing evidence. If counsel may spread the whole testimony upon the record, and then, by a general exception to the charge, enable himself to take advantage not only of a mis-direction, but of any omission to notice any question which may be sup-

posed by this court to have arisen in the case, such a course would obviously transfer to the supreme court the appropriate duties of a circuit court, and cannot be countenanced."

Two of the prominent points raised in the cause before us in this court are, whether, by the will of William Appel, the estate was devised to his executors, and whether the evidence was sufficient to warrant the presumption of a conveyance by the executors after the testator's death.

The embarrassments presented by the bill of exceptions are in determining whether the first point was raised at all at the circuit, whether the latter was submitted to the jury or not, and in weighing the testimony upon which it is founded. The first point " may be supposed to have arisen," because it was material ; but the bill does not inform us otherwise, than that the judge ruled the testimony insufficient to prove that William Appel aliened in his life-time, and sufficient, in his opinion, to entitle the plaintiff to a verdict. The second point was undoubtedly the one most strenuously urged ; but it depended upon the *weight of evidence,* and the bill does not distinctly complain that the judge refused to submit the evidence to the jury. I should infer, however, from the charge, that that question *was not submitted to the jury as a question of fact,* and the charge is excepted to in general terms.

Although, on the ground of mis-direction, the exception may be considered as raising the point, most certainly the rules of convenience and correct practice should require exceptions to be more pointed and precise.

In the supreme court, both questions have been considered as arising upon the bill of exceptions, and discussed ; and, perhaps, they should be here, especially considering that this is by no means the first case in which this looseness of practice, in this respect, has been tolerated. The first enquiry, then, is, in whom did the real estate of William Appel vest at the time of his death ? In my judgment, it vested in his executors by *implication,* and *in trust* for the children among whom the proceeds of it were directed to be divided. The argument that the executors took a fee in the estate because they had a power of sale coupled with an interest in the pro-

ceeds, appears to me to be fully met by the case of *Hunt v. Runsmore*, (8 *Wheaton*, 203,) where it is held, that a power coupled with an interest must be a power engrafted upon an estate, not an interest arising out of the execution of the power.

There are many cases in which, where an estate is conveyed coupled with a power, *such* an estate is held to pass as is necessary for the execution of the power. (1 *Ves. sen.* 485.) But the question here is, whether any estate is conveyed. There is none in express terms; but if there is an estate by implication, then, indeed, the executors have a power coupled with an interest, but neither the power of itself, nor an interest in its execution, raise an estate by implication. The power does not, because if it did, all powers would draw an estate after them, and the distinction between naked powers and those coupled with an interest would be done away. An interest in the proceeds produced by the execution of the power does not, because the implication is not a necessary one. Such an interest is perfectly consistent with the residence of the estate in any other person, until the execution of the power, and needs not the estate to uphold it.

It appears to me, therefore, that where the question is, whether *any* estate is conveyed, the doctrine of naked powers and powers coupled with an interest, is inapplicable, and does not apply until that question is settled; and the enquiry arises, what is the nature of the estate?

In all questions arising upon the construction of wills, the intention of the testator, as evidenced by the language of the instrument, is conceded to be the enquiry, and when ascertained, is to be carried into effect, if not repugnant to the rules of law.

In this case, the intention of the testator most manifestly was, that the estate should not descend to the heir, for he excludes him in the strongest language applicable both to the land itself and the rents and profits. His intention is equally manifest that the estate should be sold by his executors, and the proceeds divided among all his children. To say the least, therefore, it was consistent with his intention that the estate should vest in the executors until sale; and I take the

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

rule of law to be, that where the testator clearly evinces an intention to postpone the heir, an estate is raised by implication, if consistent with the provisions of the will and the apparent intent of the testator, and especially where such an implication is necessary, to conform to the express provisions of the will. It is no more than implying what the testator left to be implied from his general intention as expressed, and the implication is raised for the purpose of giving effect to that intention.

It is conceded that there must be express words or necessary implication to disinherit an heir. (2 *Vern.* 572.) And Lord Eldon remarks, in 1 *Ves. & Beame,* 466, "with regard to that expression, necessary implication, that in construing a will, conjecture must not be taken for implication ; but necessary implication means not natural necessity, but so strong a probability of intention, that an intention contrary to that which is imputed to the testator cannot be supposed." Lord Mansfield also held, in *Roe* v. *Sommerset,* (5 *Burr.* 2608,) "that a strong probable implication is sufficient; it needs not be a necessary one."

With these explanations of the terms, necessary implication, the doctrine would seem to me to be applicable to a case where the intention of the testator was much more doubtful than in the case before us ; and the cases, I think, shew that it has been so applied.

In the case of *Horton* v. *Horton,* (*Cro. Jac.* 74,) the devise was to the heir after the death of the testator's wife, and it was held, that the wife took an estate for life by implication. The reason assigned is, that unless the wife took the life estate the heir must, it being devised to no other person ; but as it was clearly the intention of the testator, although not so expressed in terms, that the heir should not take until after the death of the wife, the wife was held to take a life estate, that being the implied intent of the testator. The case intimates, that had the devise been to a stranger after the death of the wife, the wife would not have taken a life estate, because the heir might take it, there being no intention to exclude him expressed. The same doctrine is found in *Cro.*

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

*Eliz.* 15; 1 *P. Wms.* 474; 1 *Vern.* 22; *Cruise, tit. Devise,* ch. 10, s. 19, &c.

In the case of *Roe* v. *Sommerset,* (5 *Burr.* 2608,) the testator held a leasehold estate for 99 years, if he or his daughter Betty, or one John Burdale, should live so long; and he devised the estate to his daughter Mary, after the death of his daughter Betty. It was held that Betty took a life estate by implication. So, where the testator devised to one of four daughters, co-heiresses, after the death of his wife, the wife was held to take a life estate by implication. (2 *Vern.* 723.)

The two last mentioned cases are certainly not as strong as the preceding ones; for in neither is the devise to the person who would take as heir. The presumption of the testator's intent to postpone the heir is therefore not so strong.

In the first case, Lord Mansfield says, the presumption is a probable one, and that is sufficient; in the last, the presumption is raised from the circumstance that the devise is to one of four co-heiresses.

The principle of all these cases I take to be, that where the intention is manifest to postpone the heir, the law raises an estate by implication.; and in the case before us we have the express declaration of the testator that the heir should, in no event, take the estate.

It is said, however, that he has not given it to any other person. It is true, he has not in express terms; if he had, it would most certainly not be a case of implication, for the doctrine rests upon a want of sufficient words to constitute a technical devise.

In none of the cases above mentioned is there any devise in terms to the persons who were held to take by implication; and the only evidence of the intention of the testator that they should take is, that he postpones the heir until their death.

In this case, we have more. We have the express directions of the testator that the executors should sell the estate, divide the proceeds and retain the share of the grandson until his arrival at age. Can there be a doubt that he intended they should take the estate for that purpose, when he expressly excludes the heir? The case of *Markham* v. *Cooke,*

(3 *Burr.* 1684,) I think a strong one upon this point. The testator gave annuities to several persons, some for life and some in fee, to be paid by his trustee. He then appoints John Cooke his trustee and executor, and bequeaths him £1 10s. per annum, for repairs of his farm. Held, that the trustee took a fee in the land by implication, on the ground that such was the intention of the testator. I discover no feature in that case that is wanting in the one before us. There was no devise in terms of the land to any person ; but the intention of the testator was that the annuities should be paid out of the lands by his executor, as in this case, that the children should share the proceeds of the land. The case of *Gillard* v. *Gillard,* (5 *Barn. & Ald.* 785,) is very similar. Richard Gillard, the testator, gives several legacies, and *one to John, his heir,* to be paid by his executors, and charges his real estate with the payment. He then appoints Richard Gillard sole executor of all his lands forever, and leasehold property, &c. It was held that the executor took the fee.

Some cases have been cited as similar in principle to this, where it has been held that the heir was not disinherited. I think, however, they are clearly distinguishable, upon the principles above stated. One is the case of *Howell* v. *Barnes,* (*Cro. Car.* 382,) which was a devise to A. for life, and after her death, ordering the executors to sell and divide the proceeds. It was held, that the executors had only a bare authority and not an estate. The intention to disinherit the *heir* is wanting in this case, which, we have seen, is always necessary to raise an estate by implication. Another case is *Denn* v. *Garkin,* (*Cowper,* 657.) That was a devise of a freehold estate to three nephews without words of inheritance ; a legacy of 10s. to the heir at law, and after some other legacies, the residue of personal estate to the nephews. The nephews only took a life estate in the lands. Here also the intention to disinherit the heir was wanting. It could only be inferred from a vulgar notion that a small legacy was evidence of such an intention, which Lord Mansfield held insufficient. There is another case which I believe was not cited in 2 *Vern.* 572. It was a de-

vise to trustees to sell and divide the proceeds as the testator should by writing appoint, and for want of appointment the proceeds to go to his nephews. The testator made an appointment, but not to the value of the land, and the heir was held entitled to the surplus. The court say, "There must be express words or necessary implication to disinherit the heir." In this case, there was neither. The appointment might have been in favor of the heir, and the contingency upon which the nephews were to take did not occur. In the case of *Jackson* v. *Burr*, (9 *John.* 104,) there was neither a devise to the executors, nor, as I read the will, any authority for them to sell, much less does there appear to be any intention to disinherit the heirs. The estate, of consequence, descended. I concede that in the case before us, had the will stopped after declaring that Simon, the heir, should not take the estate, he would, nevertheless, have taken, because it would have been given *to no other person.* I grant, also, that had this clause been omitted, he would have taken, because there is no devise in express terms to the executors, and there would have been no intention manifested to postpone the heir, nor any inconsistency in his taking the estate until the executors should sell. But as the testator has said that his heir shall not take, and that his executors shall sell for the benefit of all his children, I think it is necessarily implied that the executors do take until the execution of their power as trustees for those beneficially interested in its execution. If this conclusion is correct, the plaintiffs below were not entitled to recover in the character in which they sued, as the heirs at law of Simon Appel, the heir of the patentee.

The next enquiry is as to the question of presumption. The judge declared his opinion that the evidence in the cause was not sufficient in law to prove or authorize the presumption that the premises in question had been conveyed by William Appel in his life time, or by his heirs or representatives after his death. The plaintiff in error now insists that the judge erred in this conclusion, or, at least, that the question should have been submitted to the jury.

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

The doctrine of presumptions is one about which there is much said in the books, and much that is unsatisfactory.

Starkie, in his treatise upon evidence, says, (p. 24,) "The ground of all presumptions is the necessary or usual connection between facts and circumstances, the knowledge of which connection results from experience and reflection. A presumption may be defined to be an inference as to the existence of a fact not actually known, arising from its necessary or usual connection with others which are known."

In *The Mayor of Kingston* v. *Horner*, (*Cowp.* 102,) Lord Mansfield, speaking of presumptions arising from length of time, says, "All evidence is according to the subject matter to which it is applied. There is a difference between length of time which operates as a bar to a claim, and that which is only used by way of evidence : a jury is concluded in the one case, but in the other it is left to their consideration to be credited or not, and to draw their inferences one way or the other according to circumstances."

Whether a fact which is unknown is to be presumed from its usual connection with other facts which are known, would seem to be properly, in all cases, a question for the jury ; for the probability of the existence of the unknown fact depends upon the nature and strength of the facts and circumstances known, and the strength of the presumption is measured by the weight and credit given to the facts shewn. A jury is the appropriate tribunal to weigh and appreciate such facts, and deduce inferences from them.

The modern practice of sparing jurors the exercise of their sound discretion upon the facts of a case, taking their formal verdict subject to the opinion of the court, and then presenting the whole facts to the court by means of a case or bill of exceptions, to be passed upon by the court instead of the jury, has necessarily led to adjudications upon matters of fact as questions of law ; and questions of fact which were formerly determined by the jury alone, have now become questions of law, and the jury is said to be concluded by them. As, for instance, in the case of a bond upon which no payment or acknowledgment has been made within 20 years, the court will presume it paid, and the jury are concluded by

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

the presumption.   Certain facts also have been held to raise a legal presumption of fraud by which a jury was concluded, and similar conclusive presumptions are raised in other cases, because the same state of facts has been adjudged in other cases to warrant such presumption.

But I discover nothing in the facts of this case which should preclude the jury from presuming the conveyance insisted on, if, in their judgment, the facts shewn were sufficient to warrant such an inference.   The presumption is not urged as a rule of law binding upon the jury, but by way of evidence, to which the jury may give such credit as it deserves.

In *The Mayor of Kingston* v. *Horner*, it was left to the jury to presume a grant from the crown within the time of legal memory.

In *Doe* v. *Prosser*, (*Cowp.* 217,) one tenant in common having been in possession 36 years, it was left to the jury to presume an ouster of the co-tenant.

In *Vandyke* v. *Van Buren & Vosburg*, (1 *Caines*, 84,) a conveyance was presumed in a case where it might have been claimed in favor of the person in possession.   So in the case of *Jackson* v. *M'Call*, a conveyance was presumed to quiet the possession, not, as the court say, because they thought a grant was really made.

In *Jackson* v. *Woolsey*, which was a verdict subject to the opinion of the court, a conveyance by commissioners of partition was presumed.

In the case of *England* v. *Slades*, (4 *Term R.* 682,) one Syburn had taken a lease from George Pyn and underlet to the defendant, and after the expiration of the term, brought an ejectment.   George Pyn, the landlord, had died after devising the premises to trustees in trust for John Pyn, to be conveyed to him when he should become of age.   The plaintiff claimed under a lease from John Pyn, the *cestui que trust*, but shewed no conveyance from the trustees.   He was nonsuited at *nisi prius;* but the court set it aside, remarking that there was no reason why a conveyance should not be presumed in pursuance of the trust, as it was what the trustees were bound to do, and a court of equity would enforce.

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

It is true, the defendant was in without title, and the plaintiff was equally without legal title, except by the aid of a presumption which was raised without any possession to strengthen it. The presumption, too, was of a conveyance supposed to have been made within 20 years.

The case of *Nase* v. *Peck*, (3 *Johns. Cas.* 128,) was a writ of right. The demandant claimed under an ancient possession. The tenant had been in possession 38 years, and relied upon that and evidence of a patent granted to a third person prior to either of the possessions. The judge directed the jury to find for the tenant on the ground of outstanding title; but the court say the question was, which had the better right? and that it ought to have been left to the jury to presume a conveyance to the demandant under the patent.

These are but a sample of the cases, and I think they shew that the question as to whether a fact shall be presumed or not, is ordinarily a question for the jury.

The facts shewn in this case, from which it was urged that a conveyance of the premises might be presumed from William Appel's executors so as to defeat the claim of his heir, are, that the heirs do not produce the original letters patent; that by the will of William Appel, his executors were expressly ordered to sell; that all the children were interested, as well as the executors themselves, in having a sale made; that in 1767, a bond was executed between Magdalena Peltz, under whom the plaintiff claimed, and one Killman, submitting to arbitration certain claims which she set up in behalf of herself and the other persons interested in the will of William Appel, and reciting that she insisted that a certain mortgage was purchased by John or Johannes Appel, with the monies held in trust by him under that will; that until after the revolution, the premises in question were reputed to belong to Delancey and Dubois, who were attainted and left the country; that in 1766, Delancey and Dubois conveyed a tract of land to John Glen covering a part of the Appel patent; that during the war, Magdalena Peltz, who then resided in Albany, frequently stated that she owned two houses in New-York, and no other property.

How far these facts and circumstances should go to convince a jury that William Appel or his executors actually did convey the premises so as to break the course of descent, it is unnecessary to say; but I think they go far to establish such a conclusion, and that the jury should have considered and drawn their inferences from them. It is urged, however, that the defendant was not in a situation to entitle him to shew an outstanding title against the plaintiff.

Notwithstanding the general rule that a plaintiff in ejectment must recover upon the strength of his own title, without regard to the weakness of that of his adversary, there are some cases where it has been held that the defendant shall not controvert the plaintiff's title by shewing a better in some third person, as where he entered under the permission of the plaintiff, or as an intruder upon the possession of the plaintiff without such permission, and without claim of title; or where the plaintiff claims under judgment and execution against the defendant. These are all cases where there are strong reasons why the defendant should be estopped from setting up an outstanding title, and I believe they are all the cases in which he is estopped.

This case is said to belong to the second class; and the case of *Jackson* v. *Harder*, (4 *Johns. R.* 202,) is pressed as an authority. That, however, was a case in which the defendant intruded upon the actual possession of the plaintiff. In this case, neither the plaintiffs nor any person under whom they claim, ever were in actual possession.

Where a person intrudes without claim of right upon the actual possession of another, there is reason in compelling him to restore that possession before he shall be permitted to shew title in a third person; but I apprehend the reason does not apply in a case of that constructive possession which the law implies, as always following title. Besides, if the title were shewn to be out of the plaintiff, the constructive possession would follow it.

In my judgment, the defendant was not precluded from shewing that the title was out of the lessors of the plaintiff, notwithstanding he might be unable to trace it to himself;

and that he ought to have been permitted to urge the facts and circumstances of the case to the jury, as the ground of a presumption that the premises had been conveyed by the executors of William Appel, under the power contained in his will.

If this conclusion is correct, or if the view taken of the first point is correct, that the estate of William Appel vested in his executors at the time of his death, according to the true construction of his will, then the judgment of the supreme court is erroneous, and ought to be reversed.

On the question whether the judgment of the supreme court should be *affirmed* or *reversed*, the opinion of the members of the court was as follows : For *affirmance*, the CHANCELLOR, Senators ALLEN, DAYAN, HART, M'CARTY, SANFORD, TODD, TYSEN, WHEELER and WOODWARD.

For *reversal*, Senators BENTON, ELSWORTH, HAGER, LAKE, M'MARTIN, OLIVER, SCHENCK, SMITH, STEBBINS, THROOP, WARREN and WILKESON.

The CHANCELLOR proposed that the court should definitely express the grounds upon which the judgment of this court was pronounced ; whether the court were of the opinion that by the will of William Appel an estate was given by implication to the executors, or whether they were of opinion that the facts and circumstances of the case ought to have been submitted to the jury, so as to have authorized them to presume a conveyance from William Appel the patentee, or his executors. Several members observing that their opinion had been formed only on consideration of the latter proposition, the question as to the legal construction of the will was not put. The other question, however, was put, viz. : Ought the facts and circumstances of the case to have been submitted to the jury, so as to have authorized them to presume a conveyance from William Appel or his executors, *if, in the judgment of the jury, such facts and circumstances were sufficient to warrant such inference ?* which was decided in the affirmative : Ayes *sixteen,* noes *seven.*

ALBANY,
Dec. 1828.

Schauber
v.
Jackson.

For affirm-
ance, 10.

For rever-
sal, 12.

Whereupon, it was ORDERED and ADJUDGED, that the judgment of the supreme court in this cause be *reversed*, and that the plaintiff in error recover his costs, &c.; that the record be remitted, and that a *venire facias de novo* be awarded.