IRA GREENOUGH & wife *vs*. CHARLES WELLES.
CHARLES HALL & others *vs*. BENJAMIN REMICK & others.
SAME *vs*. LUTHER BARNES.
FREDERIC OCKERHOUSEN & others *vs*. SAME.

H. died in 1773, leaving a son and two married daughters. In his will he directed his executor to sell a certain lot and invest the proceeds at interest; the interest to be paid to his two daughters equally during the life of their respective husbands, and after the husband's death, the principal to be equally divided between them. He also directed other real estate to be sold, and the proceeds to be equally divided between his daughters, and if either daughter died before her husband, the executor was to keep her share for her children. All the testator's estate was disposed of by his will, some portion being also given to his son. The executor qualified and acted as such for several years, but having fled from the country and being embraced in the act of confiscation of April 30, 1779, in July, 1779, administration *cum testamento annexo* was granted to other persons upon the estate of H. A guardian was appointed over the son of H. in 1799, as a *non compos*, and the latter died in 1830. No direct evidence exists of any conveyance of the premises mentioned in said will by the executor or the administrators, or by the son or his guardian, but deeds thereof by the daughters and their husbands exist, made in 1793 and 1799 :

*Held*, first, that the power to sell given to the executor of H. being a personal trust and confidence, was not, in case of his death or inability to act, transmissible to the administrators with the will annexed.

Greenough & wife *v.* Welles.

Second, that the power to sell was a power coupled with a trust, and was imperative and obligatory upon the executor, but that until such sale, the legal estate of the premises vested in the heirs at law of said H.

Third, that by the flight and outlawry of the executor, he became *civiliter mortuus*, and that so much of the demanded premises as descended to the son of H. as heir at law, was held by him still subject to the trusts declared by the testator for the benefit of his daughters, which it was the duty of said son to carry into effect by the sale and conveyance of the estate as provided in the will.

Fourth, that it being the legal and equitable duty of the son of H. so to convey the premises as to effectuate said trust, and the most ready and proper mode of doing this being to convey to the daughters of H. that portion legally vested in himself as heir of H., it was to be presumed that he did so, and that the entire legal and equitable interest in the estate thus became vested in the daughters.

Fifth, that this presumption being strengthened by the lapse of more than thirty years, in which the daughters of H. and their grantees had held undisputed possession of the premises, the heirs at law of the son of H. had now no claim thereto.

THE first two of these cases were petitions for partition, and the last two were writs of entry. They were all commenced March 11, 1850, and were heard before *Fletcher*, J. and by him reserved for the whole court, with liberty to draw all such presumptions and inferences from the evidence as a jury would draw, and to enter such judgment thereon as the law requires.

From the facts admitted or proved, it appeared that the petitioners and demandants all claimed as heirs at law of Benjamin Hall, deceased, son of Hugh Hall, whose title to the premises in controversy was undisputed. Hugh Hall died in July, 1773, leaving three children, Benjamin Hall, Elizabeth, then the wife of John Welch, and Sarah, wife of Elisha Clark, who was afterwards married to Wensley Hobby, both of whom survived their husbands. Said Hugh Hall, by his last will and testament, which was duly proved and allowed, July 30, 1773, among other devises, made the following provision concerning the Chamber street lot, being the premises of which partition is demanded in the first of the above-named suits, viz : " I order and direct a lot in Chamber street, near the West Meeting-house, to be sold by my executor, and I hereby authorize and empower him to execute and deliver good and legal deed or deeds of bargain and sale to the purchaser or purchasers; and the money arising thereon to be

put out at interest by my executor, the interest and principal thereof to be paid and disposed of as follows: the principal to be put to interest in safe hands by my executor, and the interest arising thereon to be by him paid, one half part thereof to my daughter Elizabeth Welch, and the other half part thereof to my daughter Sarah Clark, during the lives of their husbands; and in case either or both of the husbands of my two said daughters should die before their wives, then an equal share of the principal sum to be paid into the hands of my daughter who survives her husband." It also appeared that the premises demanded in the three last named suits were not specifically named in said will, but were included in a residuary clause contained in a codicil thereto, in the words following: " All my estate, both real and personal, that I have not disposed of by my last will and testament, I order to be sold by my executor, and the proceeds to be divided between my two daughters." There was also in the will a clause in which the testator ordered, if either his daughter Elizabeth or Sarah should die before her husband, that the executor should keep the share of either, or both of them so deceasing, for the benefit of her or their children, the principal to be divided and paid to each child, if daughters, at the age of twenty-one years, or day of marriage; but if sons, not till twenty-one years of age. By other parts of the will, which it is unnecessary here to recite, real and personal estate was devised to the son, Benjamin Hall; and it was admitted by the parties, and appeared by the will, that the testator intended by its provisions to dispose of all the estate, both real and personal, of which he died seised and possessed.

Foster Hutchinson, who was named in the will executor thereof, proved the will, July 30, 1773, and was then duly qualified and entered upon the trust. It also appeared, that said Foster Hutchinson was embraced in the act of confiscation of April 30, 1779, as a refugee, and that in consequence of his absence from the country, in July, 1779, letters of administration *cum testamento annexo*, on the estate of said Hugh Hall, were granted to two other persons. No conveyance by the executor, under the power of sale given to him

by the will, of the estate above mentioned, and now demanded in these suits, is recorded in the registry of deeds, and there is no direct evidence that such conveyance was ever made, nor is there any conveyance of the demanded premises from said Benjamin Hall, son of the testator. It further appeared that said Benjamin Hall, under whom the demandants now claim, was adjudged a *non compos*, and a guardian was appointed over him, April 23, 1799, which guardianship was continued till his death, on the 12th March, 1830.

Upon these facts, the petitioners and the demandants claimed the estate in controversy, on the ground that under the will of said Hugh Hall, a naked power only to sell the premises was given to the executor; that until such sale the title vested in the heirs at law; and that no sale having ever been made by the executor, a title to a portion of the demanded premises vested in said Benjamin Hall, the only son of the testator, as heir at law, and that his estate therein has come to the petitioners and the demandants, by descent. The respondents and tenants claimed the premises in controversy under sundry mesne conveyances from the daughters of said Hugh Hall and their husbands, the most material of which were : 1. A deed from Sarah Hobby (once Sarah Clark) and her husband, Wensley Hobby, dated November 27, 1793, conveying half of the premises involved in the first above-named suits to H. G. Otis. 2. A deed from said Sarah Hobby and her husband, dated November 19, 1799, conveying half of the premises, demanded in one of the other three suits, to William Walter. Sundry other conveyances were offered by the respondents and tenants, tending to show that the whole premises in controversy had been conveyed to them in fee-simple. They also offered evidence of sundry conveyances by Foster Hutchinson, the executor named in the will of Hugh Hall, under the power given him in said will, made during the years 1773 and 1774, of other premises than those now in controversy. Upon this point also the petitioners in the first suit put in evidence a deed from Elizabeth Welch, the daughter of said Hugh Hall, and her husband John Welch, to William Gridley, dated June 30, 1787, conveying the

whole of a lot of land in the westerly part of Boston, which was included in the codicil of the will of Hugh Hall, and was to be sold by his executor in the same manner as the premises now in controversy. This deed contained the clause, " being the same which the said Elizabeth Welch and Sarah Hobby inherit as heirs to their father, Hugh Hall, Esq. late of Boston, deceased."

Upon the foregoing facts, and others not material to recapitulate, the respondents and tenants contended : 1. That the power in question was not a collateral power, but vested in the executor an estate or interest in trust for the execution of the power. 2. That if the power was collateral, and its execution was defeated by the death or flight of the executor, the estate was held in trust by the heirs for the persons in whose favor the power was created ; and that the heirs can maintain no suit against the persons in whom the beneficial interest vested, or their grantees. 3. That the beneficial interest was by the will given absolutely to the two daughters of the testator, if they survived their husbands, which was admitted to be the fact in this case ; and that if said daughters and their heirs entered and conveyed, this, in law, was an election and constructive conversion by them of land for money. 4. That upon the facts herein stated in evidence, the court should instruct the jury that they were authorized to presume an execution of the power under which the daughters became purchasers. 5. That the petitioners' claim was barred by the statute of limitations.

*C. M. Ellis*, for the petitioners and the demandants.

*S. Bartlett*, for the respondents and the tenants.

BIGELOW, J. In order to determine the questions raised in this case, it is important, in the first place, to ascertain the true construction of those parts of the will which relate to the premises in question, and to settle the precise nature and extent of the power and authority thereby granted to the executor. It is not controverted that the power to sell, being given solely to the executor, in case of his death or inability to act, was not transmissible to the administrators with the will annexed. It was a personal trust or confidence, not given to

him *virtute officii*, nor necessary to the discharge of the ordinary duties of an executor. It could, therefore, be exercised only by the donee of the power. We think it is equally clear, that by the terms of the will, it was not a mere naked power, but it was a power coupled with a trust. A naked power is left to the free will and election of the party to whom it is given, to exercise it or not; and he cannot be compelled to do that which is left solely to his own judgment and discretion. But there is a clear and well defined distinction between a mere power, when the act is left to the will of the party to whom it is given, and powers in the nature of trusts. In cases of the latter class, the right and interests of third parties, who are beneficially interested in the trusts which arise and grow out of the execution of the power, come in, and can be enforced as against the party to whom the power is given. Mere powers are never imperative; trusts are always imperative and obligatory upon the conscience of the party intrusted. When a trust is to be effected by the execution of a power, then the trust and power become blended and binding upon the donee of the power. The most familiar instance given in the books of such a union, is the case where a power is given by a will to sell an estate with directions to apply the proceeds upon trusts. The power is then in the nature of a trust. Sugden on Powers, *c.* 6, § 3. *Gibbs* v. *Marsh*, 2 Met. 243, 251. Such seems to be the character of the power given to the executor by the terms of the will in relation to the premises in question. He is not only directed to sell the estates, but specific provisions are made for the disposition and application by him of the proceeds for the benefit of the daughters of the testator. These clearly confer on the executor not a mere naked power to sell at his discretion, but a power, by the exercise of which, important trusts were to be created for the benefit of the daughters. These trusts, by the principles of law already stated, were imperative upon the executor, and rendered the power of sale obligatory upon him.

The next question which it becomes important to consider and determine is, whether, by the terms of this will, any estate

or interest in the demanded premises was vested in the executor. There are, certainly, no words of direct devise of any part of the legal estate to him. It is only a direction to sell and apply the proceeds. There are many cases, where for the purpose of carrying out the intention of the testator, executors and trustees are held to take estates in fee by implication, without any words of limitation. This is the rule where there is a charge upon the person in respect of the estate, which cannot be carried into effect without a right in the party so charged to control the fee. In such cases it is held to pass to him by implication. Such was the case in *Oates* v. *Cooke*, 3 Bur. 1685, cited by the tenants, where a testator gave several annuities, some for life and some in fee, to be paid by his executor every year. It was there held that the executor took an estate in fee by implication, because the trusts were such that the executor could not execute them without having an estate in fee, and therefore it must have been the intent of the testator to devise a fee. *Doe* v. *Woodhouse*, 4 T. R. 89, and *Anthony* v. *Rees*, 2 Cromp. & Jervis, 75, are cases where a similar doctrine has been applied for like reasons. But none such exist in the present case. There are not only no words of limitation in the clauses of the will relating to the estates in question, but there are no duties or trusts devolved on the executor, which render it necessary to imply a grant to him of the legal estate. It was not necessary to have the fee in the executor to enable him to sell and convey the property. The heirs at law would take the legal estate, subject to be divested, immediately upon the execution of the power. Although it is very clear that the testator did not intend his son Benjamin should have any beneficial interest in the lands in question, yet this intent could be effectually carried out by the authority given to the executor to sell the estates and apply the proceeds for the benefit of the daughters. This view is strengthened by the consideration, that at that early period, the lots in question were not yielding rents and profits, which would be enjoyed by the heirs until the sale in pursuance of the power. Therefore, nothing would be lost to the daughters or gained by the son by having the

legal estate remain in the heirs for a time sufficient to enable the executor to execute the power. The result is, therefore, upon familiar principles, there being no devise of the fee of the premises in controversy, it vested, until the sale and conveyance by the executor, in the heirs at law. Co. Litt. 236 *a. Warneford* v. *Thompson,* 3 Vesey, 513; *Hilton* v. *Kenworthy,* 3 East, 553; *Schauber* v. *Jackson,* 2 Wend. 13, 33.

But it does not follow, in case of the failure to execute the power by the donee, so that it is defeated at law, that the heir holds the estate discharged of the trust. On the contrary, it is laid down in Sudgen on Powers, 394, and the rule is well supported by numerous authorities, that in such case the heir holds the estate in trust only, and if the power becomes extinguished by the death of the person to whom it is given, equity acting upon the trust will compel the heir to join in the sale of the estate for the purposes designated by the testator. This principle is one of very ancient origin. In *Garfoot* v. *Garfoot,* 1 Ch. Ca. 35, decided as early as the time of Charles II. the case was thus: lands were devised to the wife for life, afterwards to be sold by the executor for younger children's portions; the executor, and the wife die; and the younger children prefer their bill against the heir; he demurs, because but an authority in the executor, which is dead with him; but the demurrer was overruled. So too in another case, two persons were empowered to sell lands; one died; survivor and heir were compelled to sell, because " the lands were tied with a trust," which will survive in equity. 1 Ch. Ca. 35. The case at bar clearly falls within this principle. The executor had become *civiliter mortuus* in this commonwealth by his flight and subsequent outlawry, so that the power had become as effectually defeated as it would have been by the actual death of the donee. So much, therefore, of the demanded premises as were to be sold by the executor for the benefit of the testator's daughters and which descended to the ancestor of the demandants, Benjamin Hall, was held by him, subject to the trusts declared by the testator, and which were to be created and carried into effect by the sale and conveyance of the estate. This view of the nature of the power and of the duty which

devolved on the son, in connection with the legal title to the lands in question, by the incapacity of the executor to execute the power and perform the trusts under the will, leads to a result which seems to us decisive of the case.

It was clearly the intent of the testator to give to the daughters, by means of the power of sale vested in his executor, the entire beneficial interest in the demanded premises. That portion which vested in the son, Benjamin Hall, was held by him, subject to the trust declared by the testator in respect of the estate. He was, therefore, a trustee, holding a legal title, charged with specific trusts, to be carried into effect by an immediate conveyance of the estate. Now, it is a well settled rule, founded on the highest principle of equity, that courts will always freely presume grants of real estate according to the duty of trustees, it being a reasonable and just presumption, in the absence of controlling evidence, that every one will do all acts required of him in the performance of a duty or trust. This rule prevails both at law and in equity. And so readily are presumptions of this kind made that courts do not wait twenty years, or any precise period, after the duty arises. In *England* v. *Slade*, 4 T. R. 682, trustees having been directed by a will to convey to a devisee on his attaining twenty-one years of age, the court instructed the jury to presume a conveyance at any time afterwards, though considerably less than twenty years. Lord Kenyon says: " It was what they were bound to do, and what a court of equity would have compelled them to do, if they had refused. It is to be rather presumed that they did their duty. And as to the time, the jury may presume a surrender or conveyance in much less time than twenty years." So too in *Doe* v. *Sybourn*, 7 T. R. 2, it is laid down that " in all cases where trustees ought to convey to the beneficial owner, a jury might presume a conveyance according to the purposes of the trust, in order to prevent a just title from being defeated by matter of form." In all such cases the law grounds the presumption on the fact that a court of equity would compel the execution of the trust, and, in this respect, seems to approximate to the rule in chancery, that what ought to be done, shall be con-

sidered as done.  Cowen & Hill's notes to Phil. on Ev. part 1, note 298, p. 499.  *Goodtitle* v. *Jones,* 7 T. R. 43–45 ; *Jackson* v. *Schauber,* 7 Cowen, 187, 200 ; *Same* v. *Matsdorf,* 11 Johns. 91–97 ; *Vandyck* v. *Van Beuren,* 1 Caines R. 84.  The present case is one to which this presumption is peculiarly applicable. One half of the premises in controversy vested in the two daughters, as heirs at law of their father, one quarter in each and thereby to so much of the premises the legal estate and beneficial interest were united in the *cestuis que trusts.*  The other half, by the law of descents at the time of the testator's death, which gave to the elder son a double portion, descended to Benjamin Hall, the only son of the testator.  It was his duty to convey it, so as to effectuate the trusts declared in respect to it, and thus carry out the intent of the father, who had given to his daughters the entire beneficial interest in the whole premises.  The most ready and proper mode of effecting this would have been to convey the half vested in himself to his two sisters, and by thus putting in them the whole legal title, and uniting it to the entire beneficial interest, enable them to sell and convey the estates by valid conveyances, and thus realize the proceeds according to the terms of the will.  So far from this being an unreasonable or forced presumption, it is quite difficult to believe that it was not done.  We think it would be quite sufficient to rest the decision of this case upon the presumption arising from the duty thus thrown upon the demandants' ancestor to convey to his sisters the legal estate to that part of the premises in question, vested in him as heir at law, in order to effect the intent of his father, and carry out the trust which was to be created by sale of the real estate by the executor, according to the direction in the will.  But the presumption thus raised does not stand solely on this ground.  It is strongly corroborated by other facts in this case.  In the first place, there is the long period of time from the death of the testator to the time when these suits were brought, upwards of seventy years, during which no claim has ever been made by said Benjamin Hall, or in his behalf, or by persons claiming under him, although the demanded premises have been from thirty-five to upwards of

fifty years in the occupation of persons claiming by deeds under the daughters of the testator. Nor do we think that the force of the presumption derived from this long continued possession without claim of right on the part of Benjamin Hall and his heirs, is very materially weakened by the fact that said Benjamin, during a portion of the time, was under guardianship as a *non compos ;* because it was the duty of the guardian to look after the property of his ward, and competent for him to assert and protect his rights. And in this connection, the circumstance is not immaterial that the guardian was a member of the legal profession, who must have been well acquainted with the provisions of the will of Hugh Hall, because under it all his ward's property was derived. He would have been quite likely, therefore, to have enforced the claim of Benjamin to these estates, if any title to them had been outstanding in him.

Another circumstance of great significance, which goes to confirm this presumption of a grant from Benjamin Hall to his sisters, is the fact that, as early as 1787 we find them, jointly with their husbands, conveying by deeds to William Gridley, with full covenants of seisin and warranty, the whole of a lot of land in the westerly part of Boston, which was included in the codicil of the will, and was to be sold by the executor in the same manner as the premises now in controversy. This shows quite conclusively that, at that time, they and others regarded the legal title to the estates which were by the will to be sold for the benefit of the daughters of the testator as being then vested in them, and affords strong ground to believe that prior to this period the right of Benjamin, as heir at law, had been granted to them. The same inference may be drawn from the deeds of Hobby and wife to Otis, and Hobby and wife to Walter, in which they convey, with covenants of seisin and warranty, one undivided half of the demanded premises, to which they were not entitled, except by a grant of Benjamin's interest as heir at law.

It was urged that this clause in the deed to Gridley " being the same which the said Elizabeth Welch and Sarah Hobby inherit as heirs to their father, Hugh Hall, Esq. late of Bos-

49*

ton, deceased," shows that they did not claim to hold under a grant from Benjamin, and rebutted any presumption of a deed from him. But there is an obvious and satisfactory answer to this suggestion. It is very clear that the words " inherit as heirs to their father" were not used in their strict legal import; because in no view could they have inherited the whole estate, which they were then conveying, from their father. The reasonable inference is, therefore, that the words were used in a popular sense, and meant no more than that their title was derived from their father by the provisions contained in the will.

Without going into greater detail to add to the facts and circumstances already enumerated, other proofs of less significance, which tend to aid the presumption of a grant of the premises in dispute from Benjamin Hall, or entering upon a consideration of the other points raised by the parties, we are entirely satisfied, for the reasons already given, that we are not only well warranted in presuming such grant from said Benjamin Hall, but that the conclusion is quite irresistible that such conveyance was actually made.

*In the first two cases, judgment for the respondents; in the last two, judgment for the tenants.*